STATE OF NORTH CAROLINA v. EDWARD EARL DAVIS, ROGER DALE HOOD

No. 135A92

(Filed 7 April 1995)

**1. Criminal Law § 762 (NCI4th)— instruction on reasonable doubt**

The trial court's instruction on reasonable doubt did not unconstitutionally lower the State's burden of proof.

**Am Jur 2d, Trial § 1385.**

**2. Robbery § 84 (NCI4th)— attempted armed robbery—sufficient evidence of intent**

The State presented sufficient evidence of intent to commit robbery to support defendants' conviction of attempted armed robbery of a pawn shop where the State's evidence tended to show that defendants were in the pawn shop three times on the day in question; other customers and employees were in the shop the first two times; the third time was right before closing, and a brief discussion ensued about the sale of a shotgun; defendants then drew their pistols, and one defendant told the victim, a pawn shop employee, "Buddy, don't even try it," and then shot the victim twice; the victim returned fire once after falling to the floor; the second defendant then shot the victim; a second employee was ordered into the back room at gunpoint; both defendants fled the scene without taking any money or other property from the pawn shop; and defendants had robbed a

McDonald's restaurant one week prior to the incident at the pawn shop.

**Am Jur 2d, Robbery § 89.**

3. **Evidence and Witnesses § 342 (NCI4th)— attempted armed robbery—evidence of prior robbery—admissibility to show intent**

Evidence that defendants committed an armed robbery of a McDonald's restaurant one week prior to the shooting of a pawn shop employee was admissible to show intent in a prosecution for attempted armed robbery of the pawn shop where, in both incidents, defendants entered the premises armed and waited until near closing time, when no other customers were present, to commit the crime; defendants initially carried on as though they were on the premises to conduct legitimate business; and one defendant did not speak during either crime. Furthermore, the trial court did not err by refusing to exclude this evidence under the balancing test required by N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Robbery § 59.**

**Admissibility, in robbery prosecution, of evidence of other robberies. 42 ALR2d 854.**

4. **Homicide § 257 (NCI4th)— first-degree murder—shooting of pawn shop employee—premeditation and deliberation**

There was sufficient evidence of premeditation and deliberation to support defendants' convictions of first-degree murder of a pawn shop employee where the evidence tended to show that (1) the first defendant drew his pistol, pointed it at the victim, told the victim, "Don't even try it," and twice shot the victim without just cause or legal provocation while the victim was standing on the pawn shop premises, and (2) after the victim had been felled by the first defendant's shots and fired his own pistol through the counter, the second defendant pointed his pistol over the counter at the wounded victim and shot him a third time.

**Am Jur 2d, Homicide §§ 437 et seq.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

**5. Jury § 226 (NCI4th)— prospective juror—death penalty views—excusal for cause—refusal to permit rehabilitation**

The trial court did not err by excusing a prospective juror for cause during *voir dire* on death penalty views without giving defendant an opportunity to attempt to rehabilitate the juror where the juror's answers to questions by the State which formed the basis for her excusal for cause were clear and unequivocal, and there was no indication that she would have changed her position in response to questioning by defendant.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

**6. Jury § 111 (NCI4th)— capital trial—jury selection—denial of individual voir dire**

The trial court did not abuse its discretion in denying defendant's request for individual *voir dire* of potential jurors in a capital first-degree murder trial because the case attracted extraordinary publicity, billboards about the case were posted along a major thoroughfare in the county, and there was a hotline for case information where the record reflects that potential jurors were questioned as a group and individually, by both the State and defendant, regarding their knowledge of the case, whether they had read newspaper articles or seen television broadcasts regarding the trial, whether they had discussed the case in their community, and whether they had formed any opinion as to defendant's guilt; those potential jurors living in the area of the billboards were asked specific questions about the billboards; and defendant had one remaining peremptory challenge at the time of selection of the alternate jurors and was given three additional challenges for the three alternates to be selected.

**Am Jur 2d, Jury § 199.**

**7. Jury § 222 (NCI4th)— capital trial—jury selection—death penalty views—allowance of challenges for cause**

The trial court did not err by allowing the State's challenges for cause of two prospective jurors in a capital trial because of their death penalty views where both jurors were somewhat uncertain initially as to whether they could vote for the death penalty, but both ultimately answered unequivocally that they had

**STATE v. DAVIS**

[340 N.C. 1 (1995)]

feelings about the death penalty that would impair their ability to perform their duties as jurors in accordance with the trial court's instructions.

Am Jur 2d, Jury § 279.

Comment Note.—**Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon I* cases.** 39 ALR3d 550.

8. **Jury § 141 (NCI4th)— capital trial—jury selection—life imprisonment—disallowance of questions about parole eligibility**

The trial court properly refused to permit defense counsel to question prospective jurors in a capital trial as to their knowledge about parole eligibility for a defendant sentenced to life imprisonment.

Am Jur 2d, Jury §§ 205 et seq.

9. **Jury § 148 (NCI4th)— capital trial—jury selection—feelings about death penalty as deterrent—disallowance of questions**

The trial court did not err by refusing to permit defense counsel to ask prospective jurors in a capital trial how they felt about the death penalty as a deterrent to crime since the trial court may refuse to allow questions that are overly broad, incomplete, hypothetical, or that attempt to "stake-out" a potential juror.

Am Jur 2d, Jury §§ 205 et seq.

10. **Jury § 124 (NCI4th)— jury selection—improper hypothetical question**

The trial court properly sustained the prosecutor's objection to defendant's question to prospective jurors in a capital trial as to whether any of them agreed with the cliche "an eye for an eye and a tooth for a tooth" since (1) a hypothetical question which is ambiguous and confusing or contains an incorrect or inadequate statement of the law is improper, and (2) the trial court was willing to allow the question if defendant provided more clarity but defendant chose instead to abandon the question.

Am Jur 2d, Jury §§ 205 et seq.

## 11. Kidnapping and Felonious Restraint § 21 (NCI4th)— second-degree kidnapping—purpose of terrorizing victim— sufficiency of evidence

The State's evidence was sufficient to support defendant's conviction of second-degree kidnapping based upon an indictment alleging that defendant unlawfully confined and restrained the victim "for the purpose of terrorizing her" where the evidence tended to show that defendant shot a pawn shop employee during an attempted robbery; defendant then pointed his gun at the kidnapping victim and ordered her to get on the floor or he was going to shoot her, too; the victim fell to the floor and began crawling toward the back room; and defendant, in a voice that sounded as if it were right behind the victim, kept repeating the words, "Crawl back there." The restraint or removal of the victim was not a necessary part of the attempted armed robbery and shooting, and the jury could reasonably infer from the evidence that defendant intended to terrorize the victim.

**Am Jur 2d, Abduction and Kidnapping § 32.**

## 12. Evidence and Witnesses § 2172 (NCI4th)— mental health expert—episode during interview with another—basis for diagnosis—exclusion as harmless error

Defendant's mental health expert should have been permitted to testify concerning what she had been told about an episode during a jail interview of defendant by another member of the medical group charged with evaluating defendant's mental health status where earlier testimony had established that the expert relied upon information supplied by other group members in formulating her final diagnosis, since the testimony was admissible under N.C.G.S. § 8C-1, Rule 703 to show the basis for the expert's opinion. However, the exclusion of this testimony was harmless error where the jury heard testimony by the expert that she had conducted interviews with defendant and administered a battery of psychological tests to him; the expert testified that defendant manifested symptoms of child abuse, testified to instances of "self-mutilating behavior" by defendant, and described instances of verbal abuse of defendant by his father; and the expert told the jury that she ultimately diagnosed defendant as suffering from major depression, post-traumatic stress disorder, and a schizoid personality, and that defendant suffered from serious mental illness and viewed the world as a "place of constant danger."

STATE v. DAVIS

[340 N.C. 1 (1995)]

**Am Jur 2d, Expert and Opinion Evidence §§ 32 et seq.**

**Admissibility of testimony of expert, as to basis of his opinion, to matters otherwise excludible as hearsay—state cases. 89 ALR4th 456.**

13. **Criminal Law § 1337 (NCI4th)— first-degree murder— same evidence not used for two aggravating circumstances**

The trial court's submission in a capital trial of the aggravating circumstances of a previous conviction of a violent felony and commission of the murder while defendant was engaged in an attempted armed robbery of a pawn shop did not constitute impermissible "double counting" where the trial court's instructions permitted the jury to consider only a prior McDonald's robbery and an Ohio murder for the previous conviction of a violent felony circumstance and did not permit the jury to consider the attempted armed robbery as evidence of this circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

14. **Criminal Law § 1340 (NCI4th)— first-degree murder— felony murder and premeditation and deliberation—underlying felony as aggravating circumstance**

Where the evidence was sufficient to support defendant's conviction by the jury of first-degree murder based on both felony murder and premeditation and deliberation, the trial court did not err in submitting the underlying felony of attempted armed robbery as an aggravating circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in the course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

**15. Criminal Law § 1373 (NCI4th)— first-degree murder— death penalty not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, where the jury convicted defendant under theories of felony murder and premeditation and deliberation; the jury found as aggravating circumstances (1) that defendant had previously been convicted of a felony involving the use of violence to the person and (2) that the murder was committed while defendant was attempting to commit armed robbery; the jury found only four of twenty-two submitted mitigating circumstances, and only one of those four (mental or emotional disturbance) was a statutory circumstance; defendant was twenty-four years old and had been previously convicted of murder in another state several years earlier and of armed robbery committed one week prior to this murder; the evidence showed that defendant shot an innocent businessman in cold blood before an eyewitness and then threatened the life of the eyewitness; and the jury found that a nineteen-year-old codefendant played a lesser role in the murder and attempted robbery and would not have committed the crimes except for defendant's influence.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in the course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

Justices LAKE and ORR did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death as to defendant Davis and a judgment imposing a sentence of life as to defendant Hood entered by Downs, J., at the 24 February 1992 Criminal Session of Superior Court, Buncombe County, upon jury verdicts of guilty of first-degree murder in a case in which defendants were capitally tried. Defendant Davis' motion to bypass the Court of Appeals as to additional judgments imposed for attempted robbery with a dangerous weapon and second-degree kidnapping and defendant Hood's motion to bypass as to an additional judgment of attempted robbery with a dangerous weapon were allowed on 15 July 1993. Heard in the Supreme Court 16 March 1994.

*Michael F. Easley, Attorney General, by Jeffrey P. Gray, Assistant Attorney General, for the State.*

*J. Clark Fischer for defendant-appellant Davis.*

*Scott F. Wyatt and Thomas Courtland Manning for defendant-appellant Hood.*

FRYE, Justice.

Defendants were indicted on 9 September 1991 for first-degree murder and attempted robbery with a dangerous weapon. Defendant Davis was also indicted for second-degree kidnapping. They were tried capitally and jointly at the 24 February 1992 Criminal Session of Superior Court, Buncombe County, Judge James U. Downs presiding.

Defendants were found guilty of first-degree murder on theories of both premeditation and deliberation and felony murder and attempted robbery with a dangerous weapon. Defendant Davis was also found guilty of second-degree kidnapping.

Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended death for defendant Davis and life imprisonment for defendant Hood. The judge sentenced each defendant accordingly. Davis was also sentenced to forty years' imprisonment for the robbery with a dangerous weapon conviction and thirty years' imprisonment for the kidnapping conviction. The judge sentenced Hood to forty years' imprisonment for the robbery with a dangerous weapon conviction.

**STATE v. DAVIS**

[340 N.C. 1 (1995)]

The State's evidence introduced during the guilt phase tended to show the following narrated facts. On 16 August 1991, defendants visited the Leicester Pawn Shop in Buncombe County where Mark Lane, the murder victim, was working and his girlfriend, Kathleen Shively, the kidnapping victim, was helping. They made three visits. The first was between 12:00 and 12:30 p.m. Defendants purchased a police scanner. Davis asked whether Lane bought or pawned shotguns. When Lane told him that he did, Davis stated they would be back.

The next visit was at approximately 2:30 p.m. when defendants returned with a shotgun. Lane offered them $50.00. Davis rejected the offer and defendants left. During both the first and second visits, there were other customers in the store. A sign on the store stated that the store closed at 6:00 p.m.

The third visit occurred at 5:55 p.m. while Lane and Shively were preparing to close the store. Lane had placed $1,000 in cash from the cash register and a pistol in his back pocket. As defendants entered, Davis was carrying a shotgun and told Lane he would accept Lane's earlier offer of $50.00. Lane laid the shotgun on the counter and asked Shively to write up the ticket. Upon Shively's request, Davis handed her his driver's license. Immediately thereafter, Davis pulled a "cowboy type gun" from under his shirt and stated, "Buddy, don't even try it. Buddy, don't even try it." Davis was pointing the gun right at Lane, who stood with both hands at his sides. Davis then shot Lane, striking him in his left wrist. Davis shot Lane a second time, and Lane twisted around and fell to the floor. Shively then heard a third and fourth shot but did not know who fired them.

Davis, pointing his pistol at Shively, ordered her to get down on the floor "you dirty fuckin bitch, or I'm going to kill you, too." Shively fell to the floor and began crawling towards the back office. Davis kept repeating, "Crawl back there." Hood remained silent during all of these events. After hearing defendants leave, Shively called 911 and began performing CPR on Lane. Shively positively identified defendants.

A pathologist testified that Lane had three distinct gunshot wounds. One passed through his left wrist and lodged in the left chest wall. A second entered the front shoulder and exited through the back of the shoulder. A third entered the right chest and passed through the body, with the bullet causing damage to both lungs, the diaphragm, liver, and aorta. Cause of death was massive hemorrhaging secondary to the gunshot wound through the chest.

STATE v. DAVIS

[340 N.C. 1 (1995)]

A crime scene analyst with the Buncombe County Sheriff's Department, Michael Wright, observed the victim Lane lying on the floor behind the counter in the pawn shop with a stainless steel revolver near his right hand; five unspent cartridges were found in the gun. The bullet that had been fired from the pistol was removed from the ceiling, and an exit bullet hole was found in the top of the counter top. Hand wipings from the victim indicated that the victim "could have fired a gun."

Defendants were arrested near the Georgia-South Carolina state line, where they had wrecked their Ford Fairmont following a high-speed chase. Following waiver of their constitutional rights, both defendants gave separate, written statements which were substantially similar. According to Davis' statement, defendants went to the pawn shop, and Davis told Lane that they had two "hot" pistols and a shotgun for sale. Lane said he would buy them. Davis said that he laid the shotgun on the counter and then reached to pull the pistol out. The victim then "reached back like—like this and pulled out some sort—some little automatic. I guess it was a .25 or something. I don't know, and he shot, and I shot back in self defense."

Hood's statement was similar. He said the victim reached behind him, pulled out a gun, and started firing. Davis returned fire and the victim fell. Hood did not think the victim had been hit. The victim "was firing up at me, so I reached over and shot."

Statements by both defendants were later given to Charles E. Calloway, a Buncombe County detective with the Sheriff's Department. There were some inconsistencies in the statements of the two defendants on this occasion. The inconsistencies were as follows: Hood intimated that both he and Davis had pistols with them during their third visit to the pawn shop. Davis said that Hood's pistol was in the car and that Hood had gone to retrieve it before selling.

Detective Calloway also testified that his investigation did not reveal a .25 automatic anywhere near the victim's body. He testified on cross-examination that Shively made no reference to a robbery or an attempted robbery and said that Davis was carrying the shotgun "not like they were going to fire it, just carrying it like they were going to sell it." Investigation revealed that nothing was missing from the pawn shop's safe, and neither defendant was observed going into the back room or anywhere near the safe. Both money and jewelry were removed from the victim's body prior to autopsy by investigators.

Defendants did not testify or offer any evidence during the guilt phase of the trial.

During the sentencing phase, the State offered evidence that Davis had been convicted of murder in Ohio in 1976. Defendants did not testify but offered evidence from family members and professionals regarding their family histories and personal traits.

Additional evidence introduced during the trial will be discussed where pertinent to the issues raised by defendants.

### Issues Raised by Defendants Davis and Hood

#### I.

[1] First, both defendants assign error to the trial court's reasonable doubt instruction. On 12 August 1994, this Court allowed defendant Hood's motion to adopt defendant Davis' brief as to this issue. Defendants contend that the trial court instructed the jury on reasonable doubt using language which recent decisions of both this Court and the United States Supreme Court condemn as unconstitutionally lowering the State's burden of proof. Defendants rely on *State v. Bryant*, 334 N.C. 333, 432 S.E.2d 291 (1993) (*Bryant I*), in which we found error in the reasonable doubt instruction based on *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339 (1991). However, the Supreme Court of the United States vacated the judgment and remanded *Bryant I* to this Court for further consideration in light of *Victor v. Nebraska*, 511 U.S. ——, 127 L. Ed. 2d 583 (1994). *North Carolina v. Bryant*, —— U.S. ——, 128 L. Ed. 2d 42 (1994). On remand, we held that there was no *Cage* error entitling defendant to a new trial. *State v. Bryant*, 337 N.C. 298, 446 S.E.2d 71 (1994) (*Bryant II*). The instruction in *Bryant* was essentially identical to the instruction in this case; therefore, we reject this assignment of error on the basis of our opinion in *Bryant II*.

#### II.

[2] Next, defendants contend that the trial court erred when it refused to dismiss their charges of attempted armed robbery. As the basis for their contention, defendants claim that the State failed to present sufficient evidence of each of the elements of the crime charged. Specifically, defendants argue that there was insufficient evidence of intent.

The motion to dismiss must be allowed unless the State presents substantial evidence of each element of the crime charged. *State v.*

*McDowell*, 329 N.C. 363, 407 S.E.2d 200 (1991). "Substantial evidence" means " 'that the evidence must be existing and real, not just seeming or imaginary.' " *State v. Clark*, 325 N.C. 677, 682, 386 S.E.2d 191, 194 (1989) (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980)). In evaluating a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State, allowing every reasonable inference to be drawn therefrom. *State v. Locklear*, 322 N.C. 349, 368 S.E.2d 377 (1988).

Defendants were charged with attempted robbery with a dangerous weapon in violation of N.C.G.S. § 14-87. The two elements of attempted robbery with a dangerous weapon are: (1) an intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation but falls short of the completed offense. *State v. Smith*, 300 N.C. 71, 265 S.E.2d 164 (1980). Thus, "[a]n attempted robbery with a dangerous weapon occurs when a person, with the specific intent to unlawfully deprive another of personal property by endangering or threatening his life with a dangerous weapon, does some overt act calculated to bring about this result." *State v. Allison*, 319 N.C. 92, 96, 352 S.E.2d 420, 423 (1987).

The State's evidence, based on the testimony of eyewitness Kathy Shively, showed that defendants Davis and Hood were in the pawn shop three times on the day of the murder. The first two times, other customers and employees were in the store. The final time was right before closing. During this third visit, a brief discussion ensued over the sale of a shotgun. Defendants then drew their pistols, and Davis stated to the victim, Mark Lane, "Buddy, don't even try it. Buddy, don't even try it." Davis then immediately shot Lane twice. Lane returned fire once after falling to the floor. Hood then shot Lane. Davis then ordered Kathy Shively into the back room at gunpoint. After that, both defendants fled the scene. No money or property was taken from the pawn shop.

Both defendants contend that this evidence was insufficient to show that they intended to commit robbery because they neither demanded money prior to nor took any money or valuables after shooting Lane. In *State v. Smith*, as in this case, defendant did not demand money, and this Court upheld the attempted armed robbery conviction. The defendant in *Smith* pulled a gun on the store owner and said: "Don't move. . . . Don't put your hands under that counter." 300 N.C. at 77, 265 S.E.2d at 169. A passerby interrupted the defendant's act, and he fled the store. This Court, relying on *State v. Powell*,

277 N.C. 672, 178 S.E.2d 417 (1971), held that, even though the defendant did not demand money, his actions were substantial evidence of each essential element of attempted armed robbery. *Smith*, 300 N.C. at 80, 265 S.E.2d at 170.

The defendants here and the defendant in *Smith* went much further in their display and use of a firearm than the defendant in *Powell*. In *Powell*, the defendant was restrained from any action when a store clerk grabbed his wrist and seized the gun before he was able to withdraw it from a purse the defendant was carrying. At no time did the defendant in *Powell* point the weapon at anybody, nor did he make any verbal demands other than those incident to the act of purchasing. This Court held in *Powell* that the crime of attempted armed robbery was complete when the defendant placed his hand on the pistol and began to withdraw it with the intent of completing the substantive offense of armed robbery through its use. *State v. Powell*, 277 N.C. at 678-79, 178 S.E.2d at 421.

Defendant Hood's reliance upon the case of *State v. Jacobs*, 31 N.C. App. 582, 230 S.E.2d 500 (1976), is misplaced. In *Jacobs*, the State's evidence tended to show that the defendant was in a hardware store near closing time with a pistol in his belt. A store employee was at the cash register counting the day's receipts. The defendant made no gesture indicating an intent to touch, withdraw, or otherwise threaten the use of the pistol. Furthermore, the defendant did not make any demand, express or implied, for money or any other property. The Court of Appeals held that this evidence was insufficient to support a conviction of attempted armed robbery. The facts in this case are distinguishable from the facts in *Jacobs*. Here, defendants drew their pistols, and Davis told the victim, "Buddy, don't even try it." Such actions have been held to be sufficient evidence of attempted armed robbery even without a demand for money or property.

[3] Furthermore, the State offered and the trial court admitted evidence of a prior similar crime to show defendants' intent to commit the attempted armed robbery of the Leicester Pawn Shop. Defendants also assign error to the admissibility of this evidence. The North Carolina Rules of Evidence provide that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other

purposes, such as proof of motive, opportunity, intent, prepara-
tion, plan, knowledge, identity, or absence of mistake, entrap-
ment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1993).

The State offered evidence that defendants robbed a McDonald's
restaurant in Canton, North Carolina, on 9 August 1991. A victim of
this robbery, the assistant manager of McDonald's, testified that
defendants came into the restaurant near closing time, ordered food,
ate, and continued to sit at the table while it was being cleaned up.
The assistant manager, Charlene Donaldson, testified that she went to
clean one of the bathrooms and came back out into the lobby. Hood
was not there. When she passed Davis' table, he stood up behind her,
cocked a pistol, put the pistol behind her back, and said, "keep walk-
ing." Hood then came in with a shotgun and pumped it. Davis then
forced her and the manager on duty to open the safe and fill a bag
with approximately $1,900. Davis told them to "stay in the office and
don't leave for like five minutes." Hood did not speak at all while he
and Davis were in the restaurant. Hood pled guilty to the McDonald's
armed robbery. Davis was tried before a jury and found guilty.

The State contends, and we agree, that evidence of the
McDonald's robbery committed one week prior to the attempted rob-
bery in this case was sufficiently similar to show intent. In both inci-
dents, the defendants entered the premises armed and waited until
near closing time, when no other customers were present, to commit
the crime. Defendants initially carried on as though they were on the
premises to conduct legitimate business. Moreover, defendant Hood
did not speak during either crime.

Defendants argue that even if the evidence of the McDonald's rob-
bery were properly admissible, it should have been excluded under
the balancing test required by Rule 403. Rule 403 allows the exclusion
of otherwise admissible evidence if its "probative value is substan-
tially outweighed by the danger of unfair prejudice." *State v.
DeLeonardo*, 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986). "[T]he ulti-
mate test for determining whether such evidence is admissible is
whether the incidents are sufficiently similar and not so remote in
time as to be more probative than prejudicial under the balancing test
of N.C.G.S. § 8C-1, Rule 403." *State v. Boyd*, 321 N.C. 574, 577, 364
S.E.2d 118, 119 (1988). We find that there was no abuse of discretion
by the trial court in refusing to exclude this evidence since the
McDonald's robbery was sufficiently similar and occurred only one

week prior to the attempted robbery in this case. Furthermore, the trial court gave a limiting instruction that the evidence of the prior crime was being admitted solely for the purpose of showing intent.

We find that all of this evidence, when viewed in the light most favorable to the State, was sufficient to submit the attempted armed robbery charge to the jury.

### III.

Finally, defendants Davis and Hood contend that the trial court erred by submitting their first-degree murder charges to the jury. Defendants were found guilty of murder on the theories of malice, premeditation and deliberation, and felony murder. Defendants argue that there was insufficient evidence to support the commission of the underlying felony of attempted armed robbery and therefore insufficient evidence to support their convictions under the felony murder theory. For the reasons set forth in Issue II above, we find that the evidence of the underlying felony of attempted armed robbery was sufficient. This argument has no merit.

[4] Defendants further argue that there was insufficient evidence of malice and premeditation and deliberation necessary to support their convictions of first-degree murder. Malice may be implied from the use of a pistol, a deadly weapon. *State v. Porter*, 326 N.C. 489, 505, 391 S.E.2d 144, 155 (1990). Thus, the State only needed to show sufficient evidence of premeditation and deliberation. In defining premeditation and deliberation, this Court has stated:

"Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation. . . . Deliberation means an intent to kill carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. . . ."

"Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. . . . Instead, they usually must be proved by circumstantial evidence. Among other circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the

killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner."

*State v. Small*, 328 N.C. 175, 181-82, 400 S.E.2d 413, 416 (1991) (quoting *State v. Brown*, 315 N.C. 40, 58-59, 337 S.E.2d 808, 822-23 (1985) (citations omitted), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988)).

Defendant Davis contends that the evidence could have been interpreted to suggest that there was "a mutual misperception by three armed men result[ing] in the volley of gunshots that left Mark Lane dead"; therefore, there was insufficient evidence of premeditation and deliberation. However, if there is substantial evidence to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury, and the motion to dismiss should be denied. *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988). The fact that Davis drew his pistol, pointed it at the victim, and then told him, "Don't even try it," prior to shooting him is sufficient evidence of premeditation and deliberation to support a charge of first-degree murder. Furthermore, defendant killed the victim without just cause or legal provocation and after ordering him not to move while he was standing on his own premises.

Defendant Hood contends that he became "involved and embroiled in this whole ordeal when and only when Lane shot up through the counter narrowly missing [him]." In response, Hood contends that he reflexively and instinctively shot back; therefore, there was insufficient evidence of premeditation and deliberation. The fact that Hood drew his pistol and pointed it over the counter at the victim who was lying wounded on the floor, prior to shooting him, is some evidence of premeditation and deliberation. There was no evidence of provocation by the victim. The victim had been felled by the two shots fired by Davis, and Hood then shot him a third time. In addition, the question of self-defense was not even submitted to the jury, and defendant Hood does not assign this as error.

Therefore, we find that there was sufficient evidence of premeditation and deliberation to support defendants' convictions of first-degree murder and reject their assignments of error on this ground.

**STATE v. DAVIS**

[340 N.C. 1 (1995)]

## Issues Raised by Defendant Davis

### IV.

[5] Defendant Davis contends that the trial court abused its discretion by precluding him from rehabilitating prospective juror Elliot during *voir dire* on death penalty views. This issue was recently addressed in *State v. Brogden*, 334 N.C. 39, 430 S.E.2d 905 (1993), where we held that a judge erred when he refused rehabilitation on the ground that he had no authority to do so. We determined that such a ruling was within the trial court's discretionary power and that if a juror's responses to questions put by the State were equivocal and unclear, then the trial court should exercise its discretion in favor of rehabilitation by defendant.

The State properly points out that unlike *Brogden*, there was no blanket prohibition against rehabilitation here. Instead, the trial court acted on a juror-by-juror basis. Thus, *Brogden* does not control this case on its facts. We must still, however, determine whether prospective juror Elliot gave clear and unequivocal answers so that no rehabilitation was required. During the *voir dire* of Ms. Elliot, the following transpired:

MR. MOORE: How about you, Ms. Elliot?

JUROR: I don't think I could put anybody to death. I don't think.

MR. MOORE: Again, it's hard to hear.

JUROR: I don't think it's my right to put anybody to death.

MR. MOORE: Again, now is the only time that the lawyers get to chat with you and find out. It's very important that you be honest and candid with us, and you're the only one who knows. Again, I'll have to ask you the same question as I asked Mr. Lukowicz. Are your beliefs—again, I won't ask you what they are, but are there some philosophical, moral or religious beliefs that you have that are against the death penalty?

JUROR: Well, it's not anything with religion or anything like that.

MR. MOORE: I'm not asking which one it is. I'm just saying do you have some kind of internal belief, whether it's philosophical or moral?

JUROR: I just don't know if I can, you know, give somebody the death penalty.

MR. MOORE: Okay. Well, you have opinions against the death penalty personally.

JUROR: Yeah.

MR. MOORE: All right. And the issue is, would that attitude prevent you in this particular case from sitting here and listening to the witnesses and the evidence and the law as the judge gives it to you and being able to consider the death penalty as an option in this case?

JUROR: No.

MR. MOORE: You could consider the death penalty?

JUROR: Well, according to what I hear and to the case.

MR. MOORE: Okay. Well, —

JUROR: But I don't believe in the death penalty, no.

MR. MOORE: Well, Okay. Maybe I'm not phrasing my question right. I'm not understanding. What I understand you to say is you don't believe in the death penalty.

JUROR: No.

MR. MOORE: And does that mean in this case, regardless of what you hear, you couldn't come back in here with the death penalty?

JUROR: No.

MR. MOORE: You could come back in with the death penalty?

JUROR: No, I can't.

MR. MOORE: Okay. I may not be asking my question very artfully, but so—and again, let me try again because I have to ask these questions a certain way.

JUROR: Okay.

MR. MOORE: So in the event that you were back in the jury room after having convicted one or—one or both of these defendants of first degree murder, and regardless of what evidence had been presented to you, and regardless of what the judge told you

the law was, because of your personally held beliefs, again, whatever the source of those beliefs—

JUROR: Uh-huh.

MR. MOORE:—Are you saying that you could not consider the death penalty as an option?

JUROR: Right.

MR. MOORE: You are saying that?

JUROR: That's what I'm saying.

MR. MOORE: Okay. I'd submit Ms. Elliot and Mr. Lukowicz for cause, your Honor.

MR. KELLEY: I would object and ask to voir dire at this point.

MR. MOORE: Object to them both.

THE COURT: Voir dire denied. Objection is overruled. Ms. Elliot and Mr. Lukowicz, you can step aside.

Defendant argues that Ms. Elliot's initial responses were equivocal, and she answered that she "could not consider" capital punishment as an option only after a series of leading questions by the State. Defendant further argues that the equivocal nature of Ms. Elliot's initial responses suggests a strong likelihood that additional questioning by defendant would have clarified her later responses and shown that Ms. Elliot was qualified to sit as a juror under the *Witherspoon-Witt* standard.

This Court has repeatedly found no abuse of the trial court's discretion where challenges for cause are supported by prospective jurors' answers to questions propounded by the State and the defense has failed to show that further questioning would likely have produced different answers. *See Brogden,* 334 N.C. at 44-45, 430 S.E.2d at 908-09 (citing *State v. Taylor,* 332 N.C. 372, 420 S.E.2d 414 (1992)); *see also State v. Hill,* 331 N.C. 387, 417 S.E.2d 765 (1992), *cert. denied,* —— U.S. ——, 122 L. Ed. 2d 684 (1993); *State v. Smith,* 328 N.C. 99, 400 S.E.2d 712 (1991); *State v. Reese,* 319 N.C. 110, 353 S.E.2d 352 (1987); *State v. Johnson,* 317 N.C. 343, 346 S.E.2d 596 (1986). Here, we believe that prospective juror Elliot's answers, which formed the basis for her excusal for cause, were clear and unequivocal. In addition, there was no indication that she would have changed her position in response to questioning by defendant. Therefore, the trial

court did not abuse its discretion in denying defendant's request to rehabilitate her.

## V.

**[6]** In his next assignment of error, defendant Davis contends that the trial court abused its discretion in denying his request for individual *voir dire* of potential jurors. Defendant argues that this case attracted extraordinary publicity. Furthermore, billboards were posted along a major thoroughfare in Buncombe County, and there was a hotline for case information.

North Carolina statutory law provides: "In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." N.C.G.S. § 15A-1214(j) (1993). " 'The decision of whether to grant sequestration and individual voir dire of prospective jurors rests in the sound discretion of the trial court, and its ruling will not be disturbed absent a showing of an abuse of discretion.' " *State v. Murphy*, 321 N.C. 738, 740, 365 S.E.2d 615, 617 (1988) (quoting *State v. Barts*, 316 N.C. 666, 678-79, 343 S.E.2d 828, 837 (1986)).

Defendant has not shown, nor can we find, any abuse of discretion by the trial court in this case. The record reflects that potential jurors were questioned as a group and individually, by both the State and defendant, regarding their knowledge of the case, whether they had read newspaper articles or seen television broadcasts regarding the trial, whether they had discussed this case in their community, and whether they had formed any opinion as to defendant's guilt or innocence. Those potential jurors living in northwestern Buncombe County near the Leicester community, where the billboards lined the Leicester Highway, were asked more specific questions and were frequently questioned regarding the billboards. Prior to the selection of alternate jurors, defendant had used thirteen of his fourteen peremptory challenges, and he was given three additional challenges, one for each of the three alternates. Thus, this assignment of error is rejected.

## VI.

**[7]** In his next assignment of error, defendant Davis contends that the trial court erred in allowing the State to challenge prospective jurors Stroup and Thompson for cause because of their feelings about the death penalty. The standard for determining when a prospective juror

may be excluded because of his views on capital punishment is whether those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)).

After stating that he did not know if he could vote for the death penalty, prospective juror Stroup responded to the following questions:

Q:  Well, again, only you can answer those questions. And in North Carolina the law is such that if you could not under any circumstances vote for the death penalty, then it has to be an option you could consider to be able to sit on the jury. So the issue is, could you consider voting for the death penalty in this case?

A:  No.

Q:  So you can't conceive of any circumstances or evidence you might hear that would allow you to impose the death penalty?

A: No, I don't think so.

Similarly, prospective juror Thompson expressed mixed emotions about her ability to vote for the death penalty before answering the following questions:

Q:  So you can't conceive of any circumstances that would allow you to vote for death in this case?

A:  If I could sit here and tell you that I knew already—

Q:  No, I understand that, ma'am. I'm not trying to argue with you.

A:  I'm saying that according to the law, I know that I could, but I have moral convictions that tell me very strongly no.

Q:  That's fine.

A: So I say no.

Q:  That's why I'm trying to make sure we're both clear on what we're talking about. I'm not trying to put words in your mouth, but I understand you to say that you have some moral—

A:  Religious.

Q:  —or religious beliefs that would prevent you from considering the death penalty as a punishment in this case, is that right?

A: Right.

Although somewhat uncertain initially, potential jurors Stroup and Thompson both ultimately answered unequivocally that they had feelings about the death penalty that would impair their ability to perform their duties as jurors in accordance with the trial court's instructions. Therefore, we conclude the trial court properly excused prospective jurors Stroup and Thompson for cause.

[8] Defendant Davis also contends that the trial court impermissibly limited his *voir dire* of prospective jurors on three separate occasions. First, defendant argues that he was erroneously prevented from asking the following:

Q: Do you think, ladies and gentlemen, that life imprisonment means that a person is committed to prison for the balance of their natural life?

MR. MOORE: Objection.

COURT: Sustained.

Defendant argues that juror misconceptions about the possibility of early parole for a defendant sentenced to life imprisonment increase the likelihood that the jury will recommend death. Thus, this Court should allow limited inquiry into a prospective juror's views on the meaning of a life sentence. We addressed this exact issue in *State v. McNeil*, 324 N.C. 33, 375 S.E.2d 909 (1989), *sentence vacated on other grounds*, 494 U.S. 1050, 108 L. Ed. 2d 756, *on remand*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, 499 U.S. 942, 113 L. Ed. 2d 459 (1991). In *McNeil*, we stated that "[b]ecause parole eligibility is irrelevant to the issues at trial and is not a proper matter for the jury to consider in recommending punishment, we hold that the court properly refused to allow defense counsel to question potential jurors as to their knowledge about parole eligibility." *Id.* at 44, 375 S.E.2d at 916. We see no reason to depart from our holding in *McNeil*; therefore, we reject this assignment of error.

[9] Second, defendant maintains that he was impermissibly restricted from asking the following:

Q: How do you men and women of the jury feel about the death penalty as a deterrent to crime?

MR. MOORE: Objection.

COURT: Sustained.

**STATE v. DAVIS**

[340 N.C. 1 (1995)]

"Although wide latitude is given counsel in voir dire examination of jurors, the form and extent of the inquiry rests within the sound discretion of the court." *State v. Johnson*, 317 N.C. 343, 382, 346 S.E.2d 596, 618 (1986). We have repeatedly upheld a trial court's refusal to allow the defense to ask questions that were overly broad, incomplete, hypothetical, or that attempted to "stake-out" a potential juror. *See State v. Reese*, 319 N.C. 110, 121, 353 S.E.2d 352, 358 (1987); *State v. Taylor*, 304 N.C. 249, 265-66, 283 S.E.2d 761, 772 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983); *State v. Vinson*, 287 N.C. 326, 336-37, 215 S.E.2d 60, 68-69 (1975), *death sentence vacated on other grounds*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976). We find no abuse of the trial court's discretion here.

[10] Finally, defendant argues that he was impermissibly prevented from asking the following:

Q: There's an old cliche that is referred to commonly in cases of this sort, "an eye for an eye, and a tooth for a tooth." Are there any one of you men or women on the jury who feel that way?"

MR. MOORE: Objection.

COURT: Sustained. I'll let you ask that question if it has more clarity to it.

Counsel for defendant made no attempt at this time to clarify or rephrase the question. This Court has held that "hypothetical questions so phrased as to be ambiguous and confusing or containing incorrect or inadequate statements of the law are improper and should not be allowed." *Vinson*, 287 N.C. at 336, 215 S.E.2d at 68. The trial court was willing to allow the question if defendant had provided more clarity. Defendant chose instead to abandon the question. Accordingly, we find no error or abuse of discretion in the trial court's decision to sustain the prosecutor's objection.

## VII.

[11] Defendant Davis next contends that the trial court erred in denying his motion to dismiss the second-degree kidnapping charge. Defendant was indicted for kidnapping Kathleen Shively "by unlawfully confining her and restraining her without her consent for the purpose of terrorizing her." The applicable statute provides in pertinent part:

(a) Any person who shall unlawfully confine, restrain, or remove from one place to another, any other person 16 years of age or over without the consent of such person . . . shall be guilty of kidnapping if such confinement, restraint, or removal is for the purpose of:

. . . .

(3) . . . terrorizing the person so confined, restrained or removed . . ...

N.C.G.S. § 14-39(a) (1993).

Defendant claims that his motive for taking Shively into the back room was not to terrorize her. Instead, his words and conduct toward Shively were simply part of the chain of events surrounding the fatal shooting of Mark Lane and were therefore insufficient to support the offense of second-degree kidnapping. In support of his argument, defendant relies on this Court's decision in *State v. Irwin*, 304 N.C. 93, 282 S.E.2d 439 (1981). In *Irwin*, the defendant was charged with attempted armed robbery and second-degree kidnapping. The evidence tended to show that defendant forced the victim to the back of the store in order to force her to open the safe. The kidnapping indictment charged the defendant with removing the victim for the purpose of "facilitating the commission of any felony." We concluded in *Irwin* that the restraint or removal of the victim was a necessary part of the attempted armed robbery and therefore could not support a kidnapping conviction. *Id.* at 103, 282 S.E.2d at 446.

*Irwin* is factually distinguishable from this case. Here, unlike *Irwin*, the defendant was not charged with kidnapping for the purpose of "facilitating the commission of any felony," and the restraint or removal of Shively was not "an inherent and integral part" of any other felony. *Id.* Defendant in the instant case was charged with kidnapping for the purpose of terrorizing Shively. In determining the sufficiency of the evidence, "the test is not whether subjectively the victim was in fact terrorized, but whether the evidence supports a finding that the defendant's purpose was to terrorize" the victim. *State v. Moore*, 315 N.C. 738, 745, 340 S.E.2d 401, 405 (1986). We believe the evidence in this case, when viewed in the light most favorable to the State, was sufficient to support the kidnapping charge.

Terrorizing is defined as "more than just putting another in fear. It means putting that person in some high degree of fear, a state of intense fright or apprehension." *Id.* In this case, the evidence showed

**STATE v. DAVIS**

[340 N.C. 1 (1995)]

that, after shooting Lane, defendant Davis pointed his gun at Shively and ordered her to get down on the floor "you dirty fuckin bitch, or I'm going to kill you, too." Shively fell to the floor and began crawling towards the back room. She testified that defendant Davis' voice sounded as if it were right behind her, and he kept repeating the words, "Crawl back there." A jury could reasonably infer from this evidence that defendant Davis intended to terrorize Shively. Therefore, we find no error in the trial court's denial of defendant's motion to dismiss the kidnapping charge.

## VIII.

[12] In his next assignment of error, defendant Davis contends that the trial court erred in sustaining the State's objections to questions propounded to defendant's mental health expert, Dr. Faye Sultan. During the course of Dr. Sultan's testimony, the following exchange took place:

Q. There was an episode, I believe, that appeared during the conduct of an interview with Jeanine King when she was up there in the jail. Do you recall that?

A. Yes, sir, I do.

MR. MOORE: Objection. She wasn't there.

COURT: Sustained.

Q. Is that episode reflected in your clinical notes?

A. That episode is reflected in Ms. King's notes to me, yes.

Q. What did that episode—What did Ms. King tell you about that episode?

MR. MOORE: Objection.

COURT: Sustained.

Under Rule 703, an expert may give his opinion based on facts not otherwise admissible in evidence, provided that the information considered by the expert is of the type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject. N.C.G.S. § 8C-1, Rule 703 (1993); *State v. Allen*, 322 N.C. 176, 367 S.E.2d 626 (1988). Undisputed earlier testimony established that Ms. King was part of a medical group charged with evaluating Davis' mental health status and that Dr. Sultan relied upon Ms. King's information in formulating her final diagnosis. Therefore, we believe that

this evidence should have been admitted for the purpose of showing the basis for Dr. Sultan's expert opinion testimony under Rule 703 of the North Carolina Rules of Evidence.

Now we need to determine whether this error was prejudicial. The test is whether there is a reasonable possibility that had the error not occurred, a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1993). Defendant argues that the trial court's ruling prevented him from fully presenting his mitigation evidence to the jury that ultimately condemned him to death. We disagree.

Defendant failed to offer any proof as to what answer the doctor would have given. Moreover, Dr. Sultan's testimony concerning her diagnosis of Davis and the basis for that diagnosis was very comprehensive, even in the absence of the exchange in question. Dr. Sultan had conducted interviews with the defendant and administered a battery of psychological tests. She testified that Davis manifested symptoms of child abuse. She further testified to specific instances of "self-mutilating behavior" by defendant and stated that he exhibited a strong urge to harm himself. She described various instances where Davis' father had verbally abused him. Dr. Sultan ultimately diagnosed Davis as suffering from major depression, post-traumatic stress disorder, and a schizoid personality disorder. He suffered from serious mental illness and viewed the world as a "place of constant danger." He was also hypervigilant. The jury heard all of this testimony. We therefore conclude that the exclusion of the testimony in question was harmless error, as it is not likely that it affected the result of the trial. This assignment of error is rejected.

IX.

In his final assignment of error, defendant Davis contends that the trial court erred in submitting the aggravating circumstance that the murder was committed during an attempt to commit armed robbery. N.C.G.S. § 15A-2000(e)(5) (Supp. 1994). At the sentencing phase, two aggravating circumstances were submitted to the jury:

(1) Has the Defendant been previously convicted of a felony involving the use and/or threat of violence to the person?

(2) Was this murder committed by the Defendant while the Defendant was engaged in an attempt to commit robbery with a dangerous weapon?

The jury answered in the affirmative as to both aggravating circumstances.

Defendant first argues that because there was insufficient evidence to submit the attempted armed robbery charge at the guilt phase, its use as an aggravator at sentencing was erroneous. We have already determined that there was sufficient evidence to submit the attempted armed robbery charge; therefore, this argument has no merit.

[13] Next, defendant argues that the submission of both of these circumstances was impermissibly duplicitous. Defendant concedes that they would not be duplicitous if as to number one, the jury considered only the McDonald's robbery and the Ohio murder. If as to number one, however, the jury also considered the attempted armed robbery of the Leicester Pawn Shop, it would have constituted "double counting" barred by the holdings of this Court in cases such as *State v. Goodman*, 298 N.C. 1, 257 S.E.2d 569 (1979), and *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 288, 401 S.E.2d 632 (1991). We have carefully reviewed the trial court's instructions to the jury on these aggravating circumstances and find that they would not permit the duplicity for which defendant argues.

[14] Finally, defendant argues that the attempted armed robbery aggravating circumstance should not have been submitted since he was convicted under a felony murder theory. Where the jury convicts a defendant of first-degree murder based solely on the felony murder rule, it is error for the court to submit the underlying felony as one of the aggravating circumstances defined by N.C.G.S. § 15A-2000(e)(5). *State v. Silhan*, 302 N.C. 223, 262, 275 S.E.2d 450, 478 (1981). "However, when a defendant is convicted of first degree murder based on both premeditation and deliberation and the felony murder rule, and both theories are supported by the evidence, the underlying felony may be submitted as an aggravating circumstance." *State v. McNeil*, 324 N.C. at 57, 375 S.E.2d at 923. We have held that the evidence in this case is sufficient to support defendant's first-degree murder conviction based on felony murder and premeditation and deliberation. Therefore, the court did not err in submitting the attempted armed robbery aggravating circumstance.

## Preservation Issues

### X.

Defendant Davis raises three additional issues which he concedes have been decided against him by this Court: (1) the trial court erred

in instructing the jury that it had a duty to recommend death if it answered the balancing issues favorably to the State, (2) the trial court erred in placing the burden on defendant to establish the existence of mitigating circumstances, and (3) the trial court erred in allowing the State to "death qualify" prospective jurors.

We have considered these issues and find no compelling reason to depart from our prior holdings. Therefore, we reject these assignments of error.

## Proportionality

### XI.

[15] Having found no error in the guilt and sentencing phases of defendant Davis' trial, we are required by statute to review the record and determine (i) whether the record supports the jury's finding of the aggravating circumstances upon which the court based its sentence of death; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2); *State v. Sexton*, 336 N.C. 321, 376, 444 S.E.2d 879, 910, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 429 (1994); *State v. Moore*, 335 N.C. 567, 614, 440 S.E.2d 797, 824, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 174, *reh'g denied,* —— U.S. ——, 130 L. Ed. 2d 532 (1994).

In this case, the jury found the following two aggravating circumstances: (i) that defendant had been previously convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3); and (ii) that the murder was committed while defendant was attempting to commit robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5). We conclude that the evidence supports the jury's finding of each of these aggravating circumstances. After thoroughly reviewing the record, transcripts, and briefs submitted by the parties, we further conclude that there is nothing to suggest that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Our final statutory duty of proportionality review is to determine whether the punishment of death in this case is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

The pool of cases that this Court uses for comparative purposes consists of:

> *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). The pool includes only those cases which have been affirmed by this Court. *State v. Stokes*, 319 N.C. 1, 19-20, 352 S.E.2d 653, 663 (1987). In *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542 (1994), this Court clarified the composition of the pool so that it accounts for postconviction relief awarded to death-sentenced defendants:

> Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life" case for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death-affirmed" case.

*Id.* at 107, 446 S.E.2d at 564. This Court has also resolved timing issues relating to postconviction relief: "[A] conviction and death sentence affirmed on direct appeal is presumed to be without error, and . . . a post-conviction decision granting relief to a convicted first-degree murderer is not final until the State has exhausted all available appellate remedies." *Id.* at 107 n.6, 446 S.E.2d at 564 n.6.

While only cases found to be free of error in both phases of the trial are included in the pool, the Court is not bound to give citation to every case in the pool of similar cases. *State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994).

This Court has held the death penalty to be disproportionate in only seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). Of these seven cases, three involved murders committed during armed robbery: *State v. Benson*, *State v. Stokes*, and *State v. Young*. However, none of these cases is similar to the present case.

In *Benson*, the defendant was convicted of first-degree murder solely on the theory of felony murder. The victim died of a cardiac arrest after being robbed and shot in the legs by the defendant. The only aggravating circumstance found by the jury was that the crime was committed for pecuniary gain. Finally, this Court determined that the death sentence was disproportionate based in part on the fact that it appeared defendant was simply attempting to rob the victim, 323 N.C. at 329, 372 S.E.2d at 523, and defendant "pleaded guilty during the trial and acknowledged his wrongdoing before the jury," *id.* at 328, 372 S.E.2d at 523. In this case, unlike *Benson*, defendant was convicted on both theories of felony murder and premeditation and deliberation. Also, the jury here found two aggravating circumstances.

In *Stokes*, the defendant was one of four individuals who was involved in the beating death of a robbery victim. Defendant was found guilty of first-degree murder solely on the theory of felony murder, and only one aggravating circumstance was found, that the crime was especially heinous, atrocious, or cruel. This Court took notice of the fact that none of the defendant's accomplices were sentenced to death, although they "committed the same crime in the same manner." 319 N.C. at 27, 352 S.E.2d at 667. Here, defendant was convicted on both theories of felony murder and premeditation and deliberation. Moreover, the jury in this case found two aggravating circumstances.

In *Young*, the defendant and two other men went to the victim's home, where they robbed and murdered him. The jury found as aggravating circumstances that the murder was committed for pecuniary gain and during the course of a robbery or burglary. This case is distinguishable from *Young*. First, the defendant in *Young* was only nineteen years old at the time of the crime; defendant here was thirty-four. Second, defendant here had a history of violent crimes, including another murder for which he pled guilty, unlike the defendant in *Young*.

We conclude that this case is not similar to any of the above cases, where the death penalty was found to be disproportionate. Defendant here was convicted of first-degree murder under the theories of felony murder and premeditation and deliberation. The jury found the following two aggravating circumstances: (i) that defendant had been previously convicted of a felony involving the use of violence to the person, and (ii) that the murder was committed while defendant was attempting to commit robbery with a dangerous weapon. The jury also considered twenty-two mitigating circumstances and found only four. Of these four, only one was a statutory mitigating circumstance, that the capital felony was committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2).

Having reviewed all the cases in the proportionality pool, we find that no case is factually identical to the present case. This case is not a typical robbery-murder case in that defendant Davis had been previously convicted of murder in another state several years earlier and of armed robbery committed one week prior to this murder. This Court has found that a death sentence was not disproportionate where the jury found the single aggravating circumstance that the defendant had been previously convicted of a violent felony. *See, e.g., State v. Keel*, 337 N.C. 469, 447 S.E.2d 748 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 147, 63 U.S.L.W. 3643 (1995); *State v. Reeves*, 337 N.C. 700, 448 S.E.2d 802 (1994); *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). Further, the evidence of Davis' guilt was clear. Davis shot an innocent businessman in cold blood before an eyewitness, Kathy Shively. Davis then threatened Shively's life and forced her to crawl at gunpoint into the back room of the store. A conviction based on the theory of premeditation and deliberation indicates a more calculated and cold-blooded crime. *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108

L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). Moreover, the jury found that Davis' codefendant, Hood, who was only nineteen years old, played a lesser role in the murder and attempted robbery. The jury found that Hood committed the present offenses while under the influence of Davis, and but for Hood's union with Davis, he would not have committed the crimes.

Therefore, considering both the crime and the defendant, we are unable to say that the death sentence for defendant Davis is excessive or disproportionate. N.C.G.S. § 15A-2000(d)(2).

In conclusion, having carefully reviewed the record and each of defendants' assignments of error, we hold that defendants received a fair trial, free of prejudicial error.

NO ERROR.

Justices LAKE and ORR did not participate in the consideration or decision of this case.