STATE OF NORTH CAROLINA v. BRANTLEY LOCKLEAR

No. 492A87

(Filed 2 June 1988)

**1. Constitutional Law § 31— murder—private investigator—denied—no error**

   The trial court did not err in a prosecution for first degree murder by denying defendant's motion for the appointment of an investigator where defend-

State v. Locklear

ant did not make the requisite threshold showing of specific necessity in that defendant's motion contained only general allegations that defendant's attorney did not have the time or expertise to conduct the investigation, that a trained criminal investigator was needed because witnesses might be reluctant to speak, and that defendant could not obtain an adequate defense and a fair trial without an expert criminal investigator.

**2. Jury § 6— individual voir dire and sequestration denied—no error**

The trial judge in a murder prosecution did not err by denying defendant's motion for individual *voir dire* and sequestration of jurors during *voir dire* where neither the record nor defendant's argument revealed any basis for holding that the denial of the motion could not have been the result of a reasoned decision by the trial judge; moreover, defendant's argument relates primarily to the views of prospective jurors on the death penalty, which defendant did not receive.

**3. Criminal Law § 91.1— pretrial motions—continuance denied—no error**

The trial court did not err in a murder prosecution by not acting *ex mero motu* to continue a hearing on certain pretrial motions in order to provide defendant's court-appointed counsel adequate time to confer with retained counsel in preparation for the hearing where retained counsel had been in the case for at least three and a half months when the motions were heard and the record does not establish or even suggest that either counsel was not fully prepared to argue defendant's motions.

**4. Homicide § 21.5— first degree murder—motion to dismiss properly denied**

The trial court did not err in a murder prosecution by denying defendant's motion to dismiss where the evidence, viewed in the light most favorable to the State, clearly constituted substantial evidence that defendant committed the offense charged. The credibility of an accomplice who testified for the State, and his interest in the outcome, were matters for the jury to consider.

**5. Homicide § 8.1— murder—intoxication—motion to dismiss properly denied**

The trial court did not err by denying defendant's motions to dismiss a charge of murder on the ground that defendant was so impaired by intoxication that he was incapable of forming a deliberate and premeditated purpose to kill where, although there was evidence that defendant was highly intoxicated, there was also evidence from which the jury could have found that defendant nevertheless retained the capacity to premeditate and deliberate.

**6. Criminal Law § 98.1— murder—emotional display by victim's widow—jury not instructed ex mero motu**

The trial court did not err in a murder prosecution by failing to instruct the jury *ex mero motu* to disregard a display of emotion by the victim's widow where defendant did not request a curative instruction or move for a mistrial; furthermore, the trial judge witnessed the incident and was in a position to gauge its effect on the jury. N.C.G.S. § 15A-1061.

State v. Locklear

7. **Criminal Law § 73.2— murder—admission of newspaper story and photograph of crime scene—no error**

    The trial court did not err in a murder prosecution by admitting a copy of a newspaper containing a story about the death of the victim and a photograph of investigative officers making casts of tire prints at the crime scene where the article and photograph were not offered to prove the truth of the matter asserted or depicted, but to corroborate testimony, and there was no prejudice in that the article and photograph related entirely to routine crime scene investigation, they did not in any way implicate defendant, and the testimony of the State's witnesses exposed the jury to the same information in considerably greater detail.

8. **Criminal Law § 90— murder—defense counsel not allowed to impeach defendant with prior convictions—no prejudice**

    There was no prejudice in a murder prosecution from the trial judge's refusal to allow defendant to be impeached by defense counsel with evidence of his prior convictions where, although the credibility of a witness may be attacked by any party, including the party calling him, there was no offer of proof as to the matter excluded, the question was not one to which the answer was apparent from the context and the brief exchange was incidental in the context of a lengthy trial. N.C.G.S. § 8C-1, Rule 607. N.C.G.S. § 8C-1, Rule 103(a)(2).

9. **Criminal Law § 102.6— argument of prosecutor—misstatement of fact—no intervention ex mero motu**

    The trial court did not err in a murder prosecution by not intervening *ex mero motu* to instruct the jury as to a misstatement of the evidence by the district attorney in his closing argument where the argument was inaccurate in detail but not so grossly improper or prejudicial that the court should have been expected to intervene *ex mero motu.*

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) (1986) from the imposition of a sentence of life imprisonment upon his conviction of first degree murder before *Preston, J.,* at the 9 March 1987 session of Superior Court, ROBESON County. Heard in the Supreme Court 10 May 1988.

    *Lacy H. Thornburg, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

    *E. C. Bodenheimer, Jr., Freda J. Bowman, and Hubert N. Rogers, III, for defendant-appellant.*

WHICHARD, Justice.

    Defendant was convicted of first degree murder and sentenced to life imprisonment. We find no error.

The State's evidence, in pertinent summary, showed the following:

On 18 March 1986 at approximately 8:00 p.m., people in the vicinity of Albert Gibbs' small grocery store heard several shots. Shortly thereafter Gibbs was found lying in the road nearby. Dorothy Blue opened Gibbs' shirt, found blood on the right side, and checked for a pulse. Gibbs then took two deep breaths, following which Ms. Blue could detect no pulse.

An autopsy revealed a penetrating wound under Gibbs' right arm, which a pathologist determined to be a bullet wound. In the pathologist's opinion, Gibbs died from a gunshot wound.

The same evening Gaston Hoover Jones, who operated a grocery store three to four miles from Gibbs' store, observed a head "rise up" from behind an icebox and a "Kelvinator" beside his store. A person, whom Jones identified at trial as defendant, then walked out. Jones observed that defendant's left back pocket was "breached out." Jones asked defendant where he was going, and defendant said: "I'm going around here." Jones thereafter thought he could hear defendant walking in the edge of the woods. He saw a car door open and the car lights come on. He followed the car to Gibbs' store and observed the store briefly. By then the car had gone.

Jones returned home and told his wife to call Gibbs. He and his brother then returned to Gibbs' store. When they arrived, they saw Gibbs lying in the road.

Charles Wilbert Smith gave a statement to law enforcement officers and testified for the State at trial. Smith had purchased marijuana from defendant over a period of several months prior to Gibbs' death. While together taking various illegal drugs, Smith and defendant had talked. Defendant told Smith that he was heavily in debt for drugs. In February 1986, defendant asked Smith to assist him in robbing a convenience store. Defendant showed Smith a .22 caliber pistol and told him it had hollow points. Over a period of several days defendant and Smith started to commit several robberies, but each time one of them got scared and failed to follow through.

Ultimately, Gibbs' store came to their attention. They went first to Jones' store, where defendant took a .22 pistol and a ski

mask and hid behind the store between an icebox and a refrigerator. Smith observed defendant go behind Jones' store toward a trailer, with Jones following him. After running through the woods, defendant had rejoined Smith in the car. The two drove to Smith's mother's former home, where they sat in the car and shared "a joint." They talked of robbing Gibbs. They then went to Gibbs' store, where they bought gas and left. As Smith prepared to pull off, defendant said, "I'll kill that son-of-a-bitch and rob him."

When Smith and defendant were three to four hundred yards from Gibbs' store, defendant said, "Let's go back and I'll go in there and rob him." When Smith warned that Gibbs would shoot defendant, defendant replied, pointing the gun in Smith's direction: "What the hell you think I got this for? If he shoots at me, I'll kill the son-of-a-bitch."

A few minutes later Smith and defendant went back toward Gibbs' store. About halfway there, defendant said: "Well, I'm going to rob the store." Defendant stopped at a trailer house directly behind the store, took the gun, and walked toward the store. He told Smith he was going to "rob the son-of-a-bitch," and if he (Gibbs) shot at him he was going to kill him. He also told Smith to pick him up where he got out, "to come back right there . . . and he would be there."

Smith drove a short distance, made a U-turn, and drove back slowly. When he arrived back at the intersection where Gibbs' store was located, he saw a man lying on the ground and three other people nearby "crying and hollering." He looked to his right and saw defendant "squatted down in the ditch" about twenty or thirty yards behind the trailer house in the area where he had dropped him off.

When Smith picked up defendant, defendant said: "I shot that man. I shot that son-of-a-bitch. I don't know whether he's dead or not, but don't anybody know what happened here except me and you, and if you tell, I'll kill you, too." Defendant told Smith that he had told Gibbs to stop and drop his money. Gibbs then shot first, and defendant shot Gibbs three times.

Pursuant to a search warrant obtained after an investigation and receipt of the statement from Smith, officers searched de-

fendant's house. They seized a .22 caliber R.G. Model 23 Revolver and a box of .22 caliber hollow point bullets. An S.B.I. agent, who qualified as an expert in firearms and tool marking identification, testified that the .22 bullet that killed Gibbs had the same rifling characteristics as — and microscopic similarities to — the bullets he test fired from the pistol seized at defendant's house. He also testified that the bullet that killed Gibbs and the six live rounds removed from defendant's pistol were "the same manufacture."

Defendant presented evidence showing the following:

He consumed alcoholic beverages virtually all the time and used a variety of drugs. On the day Gibbs was killed, he had consumed six or seven Tylenol IV tablets, some prescribed pills, and a pint and a half of vodka. He had passed out and was awakened around 6:00 p.m. by Smith pulling on him and asking for drugs.

Smith asked defendant to take him to his home in Pembroke. Defendant took a sleeping pill and two Tylenol IVs, then left with Smith. Defendant's gun was in the car because he had "had it out shooting . . . in the canal . . . behind [his] house."

Smith drove, and defendant consumed four or five beers. Defendant then went to sleep and did not regain consciousness for some time. When he regained consciousness, he called his wife and asked that she come for him. This occurred at approximately 9:00 p.m.

Defendant did not know Gibbs and had never been to Gibbs' store. He learned of Gibbs' death when he "[h]eard [his] wife reading it in the newspaper."

Smith had told defendant that he was getting so far behind on his alimony that he was expecting his probation officer to have him "picked up." Smith spoke of needing money every time defendant saw him.

A licensed clinical psychologist testified that a man of defendant's age and weight, with his history of alcohol abuse, who had consumed the amount of alcohol and drugs that defendant testified to having consumed on the date Gibbs was killed, would have been "significantly intoxicated." He considered it "very likely" that such a person would have been in a "passed out and/or blacked out" state.

[1]  Defendant first contends that the trial court erred in denying his motion for the appointment of an investigator to aid in the preparation of his defense. N.C.G.S. § 7A-450(b) provides that "[w]henever a person . . . is determined to be an indigent person entitled to counsel, it is the responsibility of the State to provide him with counsel and the other necessary expenses of representation." N.C.G.S. § 7A-450(b) (1986). However, it is well established that in this jurisdiction "the defendant must show a particularized need for the requested expert." *State v. Hickey*, 317 N.C. 457, 468, 346 S.E. 2d 646, 654 (1986). *See also State v. Penley*, 318 N.C. 30, 51, 347 S.E. 2d 783, 795-96 (1986); *State v. Artis*, 316 N.C. 507, 512-13, 342 S.E. 2d 847, 850-51 (1986). This requirement accords with decisions of the United States Supreme Court. *See Caldwell v. Mississippi*, 472 U.S. 320, 86 L.Ed. 2d 231 (1985); *Ake v. Oklahoma*, 470 U.S. 68, 84 L.Ed. 2d 53 (1985).

The motion here for an investigator contained only general allegations that defendant's attorney did not have the time or expertise to conduct the investigation, that because witnesses might be reluctant to speak it would "take a trained criminal investigator to conduct the investigation," and that without an expert criminal investigator defendant could not "obtain an adequate defense and a fair trial." These allegations amount to "little more than undeveloped assertions that the requested assistance would be beneficial." *Caldwell v. Mississippi*, 472 U.S. at 323-24 n. 1, 86 L.Ed. 2d at 236 n. 1. We thus hold that defendant has failed to make the requisite threshold showing of specific necessity, and the trial court did not abuse its discretion in denying the appointment of an investigator. *State v. Artis*, 316 N.C. 507, 513, 342 S.E. 2d 847, 851.

[2]  Defendant next contends that the trial court erred in denying his motion for individual voir dire of jurors and sequestration of jurors during voir dire. The gravamen of his motion was that the voir dire would include sensitive and potentially embarrassing questions exploring the prospective jurors' bias or prejudice in a capital case, and that prospective jurors who were not being questioned would be "highly susceptible" to being influenced by those who were. The gravamen of his argument on appeal is that some jurors were tainted by the responses given by others to questions regarding their feelings about the death penalty.

"In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." N.C.G.S. § 15A-1214(j) (1983). However, this provision does not grant either party an absolute right. *State v. Barts*, 316 N.C. 666, 678, 343 S.E. 2d 828, 837 (1986). The decision rests in the sound discretion of the trial court, and its ruling will not be disturbed absent a showing of an abuse of discretion. A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *Id.* at 678-79, 343 S.E. 2d at 837. *See also State v. Reese*, 319 N.C. 110, 119-20, 353 S.E. 2d 352, 357 (1987); *State v. Jackson*, 309 N.C. 26, 34, 305 S.E. 2d 703, 710 (1983).

Neither the record nor defendant's argument reveals any basis for holding that the denial of this motion could not have been the result of a reasoned decision. Further, the argument relates primarily to alleged prejudice from questions regarding the views of prospective jurors on the death penalty, and defendant did not receive the death penalty. We find no abuse of discretion in the denial of the motion.

[3] Defendant next contends that the trial court erred by not acting *ex mero motu* to continue a hearing on certain pretrial motions in order to provide his court-appointed counsel adequate time to confer with retained counsel in preparation for the hearing. The background of the argument is as follows:

On 26 August 1986, upon defendant's affidavit of indigency, attorneys Cabel Regan and Kenneth E. Ransom were appointed to represent defendant. On 31 October 1986 attorney Freda J. Bowman filed a Notice of Limited Representation, which stated that she represented defendant in "[a]ll further Superior Court Proceedings." On 31 October 1986 Bowman also filed two motions on defendant's behalf. On 6 November 1986 Regan and Ransom moved for permission to withdraw as counsel on the ground that defendant had requested that they do so to enable Bowman to represent him. On 21 January 1987 Bowman filed several other motions on behalf of defendant. On 30 January 1987 the trial court allowed Regan and Ransom to withdraw. On 16 February 1987 Bowman filed a motion seeking appointment of co-counsel to

represent defendant, and the trial court appointed E.C. Boden-heimer as co-counsel. On 17 February 1987 the trial court heard numerous motions filed on defendant's behalf. On 19 February 1988 it entered an order denying most of these motions. The order recites that Bodenheimer was present for the hearing on the motions.

Defendant concedes that he did not move for a continuance of the hearing. He further concedes that even when such a motion is made, its grant or denial is normally within the sound discretion of the trial court and is reviewable only for abuse of that discretion. *State v. Billups*, 301 N.C. 607, 609-10, 272 S.E. 2d 842, 845 (1981). He nevertheless argues that he had a constitutional right to effective assistance of counsel, and that a reasonable opportunity for counsel to prepare is inherent in that right. When a constitutional right is involved, a motion to continue is deemed on appeal to present a question of law, and is therefore reviewable. *Id.* at 610, 272 S.E. 2d at 845. Defendant thus argues that we should find "plain error" in the trial court's failure to continue the hearing *ex mero motu* to allow his newly appointed counsel time "to adequately acquaint himself with the motions at hand."

An indigent defendant's right to the appointment of *additional* counsel in capital cases is statutory, not constitutional. *See* N.C.G.S. § 7A-450(b1) (1986). Defendant thus had no *constitutional* right to the assistance of such counsel, in the hearing of his motions or otherwise. The record establishes that retained counsel had been in the case for at least three and one-half months when the motions were heard. It does not establish, or even suggest, that either appointed or retained counsel was not fully prepared to argue defendant's motions on 17 February 1987. We thus find this argument without merit.

[4] Defendant next contends that the trial court erred in denying his motions to dismiss. He argues that State's witness Smith "is simply not telling the truth about the killing," that Smith had the greater motive to kill Gibbs because he was more in need of money than defendant was, and that Smith's testimony "was not substantially sufficient to convince a reasonable trier of fact that [defendant] was the perpetrator of the offense, most especially when considering his interest in the outcome of this case."

On a motion to dismiss, the trial court must view the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from it. *State v. Williams*, 319 N.C. 73, 79, 352 S.E. 2d 428, 432 (1987) (quoting *State v. Young*, 312 N.C. 669, 680, 325 S.E. 2d 181, 188 (1985)). If there is substantial evidence — whether direct, circumstantial, or both — to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied. *Id.*

The evidence set forth above, viewed — as required — in the light most favorable to the State, clearly constituted substantial evidence that defendant committed the offense charged. Smith's credibility, and his interest in the outcome, were matters for the jury to consider. If believed, however, Smith's testimony, together with the other evidence presented by the State, clearly permitted a reasonable inference that defendant was the perpetrator of the Gibbs murder.

**[5]** Defendant also argues that the trial court should have granted his motions to dismiss because the evidence established that he was so impaired by intoxication that he was "incapable of forming a deliberate and premeditated purpose to kill." We disagree.

> If at the time of the killing, the defendant was so intoxicated as to be utterly incapable of forming a deliberate and premeditated intent to kill, he could not be found guilty of first degree murder, because an essential element of the crime would be missing. *See State v. Propst*, 274 N.C. 62, 71-72, 161 S.E. 2d 560, 567 (1968). However, "no inference of the absence of deliberation and premeditation arises from intoxication as a matter of law," *State v. Murphy*, 157 N.C. 614, 619, 72 S.E. 1075, 1077 (1911), because intoxication does not necessarily render a person incapable of engaging in the thought process of premeditation and deliberation.

*State v. Lowery*, 309 N.C. 763, 766-67, 309 S.E. 2d 232, 236 (1983). While there was considerable evidence here that defendant was highly intoxicated, there was also evidence from which the jury could have found that he nevertheless retained the capacity to premeditate and deliberate. One witness, who had observed defendant on the evening in question, testified that defendant had

walked and talked normally, that defendant had not staggered "a bit," and that he did not smell anything on defendant. The witness Smith testified to extended conversations with defendant which contained numerous avowals by defendant of a preformed intent to kill Gibbs. "If any evidence reasonably tended to show that defendant formed the specific intent to kill [Gibbs] and that this intention to kill was preceded by premeditation and deliberation, then the denial of defendant's motion[s] was proper." *Id.* at 767, 309 S.E. 2d at 236. The foregoing constituted such evidence. The evidence thus "did not warrant a finding, as a matter of law, that defendant was incapable of forming the specific intent to kill." *Id.* at 769, 309 S.E. 2d at 238. Therefore, the motions to dismiss were properly denied. For the same reasons, the motions to set aside the verdict and for a new trial were also properly denied.

[6]  Defendant next contends that the trial court erred by failing to instruct the jury *ex mero motu* to disregard a display of emotion by the victim's widow. When the district attorney called the widow as a witness, a spectator informed the court that the widow had "gone outside." There was a brief delay while the bailiff checked on the witness, following which the bailiff informed the court: "She said she's unable to come in." The reason given was: "She's crying." The court thereupon took a brief recess. It sent the jury to the jury room with instructions not to speak about the case and to "keep an open mind."

Defendant did not request a curative instruction or move for a mistrial. *See* N.C.G.S. § 15A-1061 (1983) (upon motion, trial court must declare mistrial if prejudicial conduct occurs inside or outside courtroom). He now argues that he was denied a fair and impartial trial by the court's failure to instruct the jury to disregard this display of emotion. The record, however, provides no basis for such a conclusion. The trial court witnessed the incident and was in a position to gauge its effect on the jury. As we stated in finding no error in the failure to instruct regarding a similar incident: "Aside from defendant's failure to request a curative instruction, such an instruction may well have highlighted the witness's emotional state; indeed it is possible that the defense attorney declined to request a curative instruction because of the likelihood that it would emphasize the witness's outburst." *State v. Blackstock*, 314 N.C. 232, 245, 333 S.E. 2d 245, 253 (1985). As in

*Blackstock*, "we find no error in the court's failure to give a curative instruction with regard to this matter." *Id.*

[7] Defendant next contends that the trial court erred in admitting into evidence a copy of a newspaper containing a story about the death of the victim and a photograph of investigative officers making casts of tire prints at the crime scene. He argues that this was hearsay which put before the jury a portion of the pretrial publicity in the case.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1986). The article and photograph were not offered to prove the truth of the matters asserted or depicted therein, but to corroborate certain testimony of the witness Smith. They thus were not hearsay.

Moreover, even if they were hearsay, "the erroneous admission of hearsay is not always so prejudicial as to require a new trial." *State v. Hickey*, 317 N.C. 457, 473, 346 S.E. 2d 646, 657 (1986). "The defendant must still show that there was a reasonable possibility that a different result would have been reached at trial if the error had not been committed." *Id.*

We have reviewed the article and photograph, and we conclude that they relate entirely to routine crime scene investigation. The article and photograph were published on the day following the killing. The investigation was then in its early stages, and neither the article nor the photograph in any way implicates defendant. The jury was exposed to the same information contained in the article and the photograph, in considerably greater detail, by the testimony of the State's witnesses at trial. We thus find no merit in this argument.

[8] Defendant next contends that the trial court erred by not allowing defense counsel to impeach him with evidence of his prior criminal convictions. The argument is based on the following exchange at the outset of direct examination of defendant:

Q. What have you been tried and convicted of?

A. Speeding and—

MR. BRITT: Object to her impeaching her own witness.

THE COURT: Sustained.

MR. BRITT: Move to strike.

THE COURT: Motion to strike allowed. Members of the jury [you are] not to consider the question.

The credibility of a witness may now be attacked by any party, including the party calling him. N.C.G.S. § 8C-1, Rule 607 (1986). However, "[e]rror may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." N.C.G.S. § 8C-1, Rule 103(a)(2) (1986).

Here, defendant made no offer of proof as to the matter excluded, and the question was not one as to which the answer was apparent from the context in which the question was asked. We thus have no basis for concluding that a substantial right was affected, and the ruling in question cannot be the predicate for an assertion of error on appeal. Further, in the context of a lengthy trial this brief exchange was altogether incidental, and defendant has failed to carry his burden of showing prejudice from the ruling. N.C.G.S. § 15A-1443(a) (1983).

[9] Defendant finally contends that the trial court erred in failing to intervene *ex mero motu* to instruct the jury as to a misstatement of the evidence by the district attorney in his closing argument. The contention is based on the following sequence at trial:

Defendant's wife, a defense witness, testified that on one occasion she had taken out a warrant against defendant for aggravated assault. The trial court subsequently struck this testimony, on the ground that it was irrelevant, and instructed the jury not to consider it.

Thereafter, a clinical psychologist, who had treated defendant for alcohol dependency, testified as an expert witness for defendant. The witness had reviewed all of defendant's medical records, and in his testimony he related material from the records concerning defendant's physical and mental health.

On cross-examination the district attorney questioned this witness concerning a warrant in the records which charged defendant with communicating a threat to kill his wife and two children. In his jury argument, the district attorney used this incident as the basis for arguing that defendant had attempted to hide information from the jury. He argued that the State had "been completely open and fair and direct . . . in giving [the jury] every scintilla of evidence in the case." He then argued that defendant had not reciprocated, stating:

> Has the defense done the same, Ladies and Gentlemen of the Jury? When brother Jordan was on the stand, and on cross examination, he was asked, "Did you deliver, now, during the break, all of the hospital records that you were supposed to deliver to the State for cross examination? Yes, I did. Well, open up that file there and look at the piece of paper that is on the top. Did you deliver that to the State? No, sir, I didn't. What was it? It was a warrant for the indictment of this defendant for aggravated assault involving three persons by the use of a rifle."
>
> Now, is that laying all the cards on the table, Ladies and Gentlemen of the Jury?

Defendant contends that this argument related to the nonexistent crime of aggravated assault, and that the court "committed plain and prejudicial error by failing to instruct the jury as to [this] misstatement of the evidence." Because defendant failed to object to the argument, the standard for review is as follows:

> In capital cases . . . an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

*State v. Brown,* 320 N.C. 179, 194-95, 358 S.E. 2d 1, 13 (1987) (quoting *State v. Johnson,* 298 N.C. 355, 369, 259 S.E. 2d 752, 761 (1979)). Viewing the argument here in light of this standard, we conclude that defendant has not shown prejudicial error. Evidence of the warrant was properly before the jury through the

testimony on cross-examination of defendant's psychological expert. The only misstatement of the evidence in the argument was the reference to the warrant as one for aggravated assault rather than for communicating threats. The point of the argument was the witness' lack of candor, not the warrant itself. While inaccurate in detail, the argument was not so grossly improper or prejudicial that the trial court should have been expected to intervene *ex mero motu.*

An able, dedicated veteran of this State's superior court bench presided over defendant's trial. We have carefully examined the record in light of the arguments presented, and we conclude that defendant received a fair trial, free from prejudicial error.

No error.