STATE v. JONES

[143 N.C. App. 514 (2001)]

———————————

STATE OF NORTH CAROLINA v. JAMES DOUGLAS JONES, Defendant

No. COA00-68

(Filed 15 May 2001)

**Sexual Offenses— sexual activity by custodian–Job Corps employee**

The trial court did not err in a prosecution against a Job Corps employee for voluntary sexual activity with a sixteen-year-old Job Corps participant by refusing to grant motions to dismiss the charge of sexual activity by a custodian. *State v. Raines*, 319 N.C. 258, does not require that a victim be involuntarily or physically confined or that an institution obtain legal custody for the victim to be considered in "custody" under N.C.G.S. § 14-27.7(a). In accordance with *Raines*, the victim here was in the Job Corps'

care, preservation, and protection and was therefore within its "custody."

Appeal by defendant from judgment entered 1 July 1999 by Judge Charles C. Lamm, Jr. in Superior Court, Transylvania County. Heard in the Court of Appeals 22 February 2001.

*Attorney General Michael F. Easley, by Assistant Attorney General Elizabeth L. Oxley, for the State.*

*Timithy R. Cosgrove for defendant-appellant.*

TIMMONS-GOODSON, Judge.

James Douglas Jones ("defendant") was indicted on two counts of sexual activity by a custodian in violation of North Carolina General Statutes section 14-27.7(a). The jury found defendant guilty of one indictment count, and the trial court imposed an active term of imprisonment. Defendant now appeals.

The State's evidence established that defendant was employed as a recreational assistant at the Schenck Job Corps Civilian Conservation Center ("Job Corps" or "the Corps") in Pisgah Forest, North Carolina. Job Corps is a facility operated by the United States Forest Service for the purpose of providing "a safe and secure living environment in which students experience personal growth, [and] learn self-management [and] personal responsibility in both independent and community living skills." To enroll in Job Corps, an individual must be between the ages of sixteen and twenty-one and must be "a low-income individual." 29 U.S.C.A. § 2884 (West 1999). According to the Corps' Director, Roger Mullens ("Mullens"), individuals must also be "[h]igh risk," in that they "dropped out of school," have a "lack of skills," be "in unemployed areas," or are "not . . . able to make a living on their own." Participants in the Job Corps program do so on a voluntary basis and are allowed to withdraw at any time. Upon arrival, the students' orientation manuals congratulate them on their "new job," and inform them that they are "working for the Federal Government" and that their "job is to participate in a training program." Job Corps provides students with job training and placement, employment, education opportunities, a clothing allowance, food, and on-campus housing and medical care. Job Corps further provides a variety of recreational activities.

Mullens testified that the program has "portal to portal responsibility legally [to participants], . . . meaning [legal responsibility] from

their front door back to their front door." As such, Job Corps maintains an accountability policy, pursuant to which students are required to sign in and out when going off-campus and abide by a nightly curfew, which is enforced with two "bed checks." Students are not allowed to have cars and rely on the Corps for transportation. The Corps periodically checks lockers and routinely checks the luggage of students returning from off-campus visits for contraband.

Students are allowed to leave Job Corps for "on-the-job training" and other employment. Students are further allowed unsupervised weekend and night visits, if they obtained a certain status and receive permission. If a student is absent for more than a twenty-four-hour period without permission, they are considered "[a]bsent without leave" or "AWOL," and as a result, Job Corps discontinues their pay. The Corps "is not responsible for students" who are classified as "AWOL" and cannot therefore provide help "if [the students are] arrested or injured." If a student is AWOL or in a prohibited area, that student could receive a "write-up" and be restricted to the center or receive a fine. If a student receives too many "write-ups," he or she could be terminated from the program. If an unemancipated minor goes unaccounted for within an hour of when they are to return to the Corps' campus, the Corps notifies the local authorities and the participant's parents.

A panel evaluates the students on a monthly basis to determine their status, which in turn determines their privileges. Job Corps policy provides that the program does not treat minor participants and young adults differently, with two exceptions. First, parents of unemancipated minors must consent to their child's enrollment in the program and must further give authorization for medical treatment. Second, for an unemancipated minor to receive an unsupervised pass, the parents must sign a consent form.

Pursuant to an "Employee Standards of Conduct with Students" form signed by all employees, Job Corps employees are strictly prohibited from dating or engaging in sexual relations with students. Defendant in this case signed a standard of conduct form.

Bobbie Jo McClendon ("McClendon"), the alleged victim, began the Job Corps program in June 1997 at the age of sixteen. According to McClendon, she decided to enroll because "[she] was doing real bad at home, . . . needed to do something better . . . [, and] [t]here was nothing there at home to do[.]" McClendon and her mother signed a

"Job Corps Consent Record," in which they both consented to McClendon's participation in the program and authorized routine medical treatment. McClendon's mother further gave permission for McClendon to receive unsupervised weekend passes. According to McClendon's own testimony, she understood that Job Corps' rules were strict, in that it had a "zero tolerance" policy, "[no] drugs, violence, sexual harassment and fighting."

While at Job Corps, McClendon was a full-time residential participant and was housed in one of the dormitories with other female participants between the ages of sixteen and twenty-six. Pursuant to Job Corps policy, McClendon received ten dollars every two weeks, an amount which was gradually increased to thirty-four dollars. McClendon also worked at a local fast food restaurant to supplement her income. McClendon attended classes during the week and a mandatory "dorm meeting" everyday. There were no scheduled activities on the weekends, and during all free periods, McClendon could go anywhere on campus for social or recreational activities.

Defendant was a recreational assistant in McClendon's physical education class during the Spring and Summer of 1998. One day after class, defendant approached McClendon in "a sexual way," at which time, he and McClendon began a sexual relationship that lasted until July 1998. McClendon testified that she and defendant had sexual intercourse between five or six times, in a variety of places on the Job Corps campus. According to McClendon, all of her sexual encounters with defendant were consensual, and defendant never came to her dormitory or any scheduled activities.

A Job Corps instructor learned of the relationship between defendant and McClendon, and an investigation ensued. Defendant subsequently gave a written statement to local authorities, in which he confessed to having consensual sex with McClendon. Defendant was thereafter arrested.

Prior to trial, defendant moved to dismiss the charges against him, arguing that there was no custodial relationship between Job Corps and the prosecuting witness. After a hearing on the motion, the trial court denied defendant's motion without prejudice. Following the presentation of evidence at trial, defendant again moved to dismiss, arguing the lack of a custodial relationship. Defendant did not present any evidence. The trial court denied defendant's motion, and defendant's appeal is now before this Court.

Defendant's only argument on appeal is that the trial court erred in denying his motions to dismiss. In ruling on a motion to dismiss, the trial court must examine, in the light most favorable to the State, whether substantial evidence exists to support the essential elements of the charged offense. *State v. Vause*, 328 N.C. 231, 400 S.E.2d 57 (1991). "If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988) (citation omitted).

Defendant was charged with sexual activity by a custodian, pursuant to section 14-27.7(a) of our General Statutes. Section 14-27.7(a) provides, *inter alia*:

> [I]f a person who is an agent or employee of any person, or institution, whether such institution is private, charitable, or governmental, *having custody of a victim of any age* engages in vaginal intercourse or a sexual act with such victim, the defendant is guilty of a Class E Felony. Consent is not a defense to a charge under this section.

N.C. Gen. Stat. § 14-27.7(a) (1999) (emphasis added). Defendant's only contention on appeal is that Job Corps did not have "custody" of McClendon, as defined by section 14-27.7(a), because like all Job Corps participants, she was "under no physical or mental disability . . . and [her] freedom to come and go has not been restricted in any manner but for a number of the institution's [r]ules and [r]egulations." Defendant's arguments further suggest that we adopt the definition of "custody" previously applied in the context of custodial interrogation, wherein custody implies physical force or legal control. Defendant argues that this narrow interpretation of "custody" is dictated by the principle that criminal statutes should be strictly construed against the State. With defendant's argument, we cannot agree.

Our Supreme Court has previously rejected a similar interpretation of "custody" under section 14-27.7(a) in *State v. Raines*, 319 N.C. 258, 354 S.E.2d 486 (1987). In *Raines*, the defendant, a nurse at a private hospital, repeatedly sexually assaulted a voluntary patient and was subsequently convicted pursuant to section 14-27.7(a). On appeal, the defendant argued that the patient was not in custody, as defined by the statute, because "the patient voluntarily submit[ted] to the hospital's care and control and thus c[ould] leave or refuse treatment at any time." *Id.* at 262, 354 S.E.2d at 489. Therefore, the defend-

ant, like defendant in the case *sub judice*, argued that the meaning of custody should be limited "to legal control or restraint." *Id.*

The North Carolina Supreme Court rejected the defendant's interpretation of "custody," holding:

> We do not believe the General Assembly intended such a narrow construction. Words in a statute generally must be construed in accordance with their common and ordinary meaning, unless a different meaning is apparent or clearly indicated by the context. *State v. Koberlein*, 309 N.C. 601, 605, 308 S.E.2d 442, 445 (1983). The ordinary meaning of the word "custody" is not limited to legal control or restraint. The word's definitions include an aspect of care, preservation, and protection as well. *See* Burton, Legal Thesaurus 131 (1980) ("care, charge, control"); Black's Law Dictionary 347 (5th ed. 1979) (the "care and control of a thing or person"); Webster's New International Dictionary (3d ed. unabridged 1964) (the "act or duty of guarding and preserving"). Voluntary patients in a private hospital place themselves in the care, charge, and control of the institution. The normal role of the hospital is to guard, preserve, and restore the health of patients who are in its care, charge or control. We thus conclude that the ordinary meaning of the word "custody," in the context in which it is used here, applies to voluntary patients in a private hospital.

*Id.* The Court further noted that: "While voluntary patients in private hospitals may have the legal power to terminate their stay, in reality their physical freedom is normally restricted by the condition that motivated their admission." *Id.* at 262-63, 354 S.E.2d at 489.

The Supreme Court recognized that strict construction of criminal statutes against the State was favored. *Id.* at 263, 354 S.E.2d at 489. However, the Court concluded that this well-established canon of construction was " 'not an inexorable command to override common sense and evident statutory purpose. . . . Nor does it demand that a statute be given the "narrowest meaning"; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers.' " *Id.* (alteration in original) (quoting *United States v. Brown*, 333 U.S. 18, 25-26, 92 L. Ed. 442, 448, *reh'g denied*, 333 U.S. 850, 92 L. Ed. 1132 (1948)).

In the case *sub judice*, residential Job Corps participants, like the hospital patients in *Raines*, voluntarily relinquished much, but not

all, of their freedom to the care, charge, and control of Job Corps staff in "a safe and secure living environment." Job Corps provides basic needs to participants, including food, clothing, and medical care. The Corps' staff monitors resident participants through an extensive accountability system. This system is particularly strict in regards to un-emancipated minors like McClendon, whose parents or legal guardians must give consent for their enrollment and are alerted if the minor becomes missing. The program enforces a "zero tolerance" drug, alcohol, and violence policy and disciplines participants for violating that policy and other rules. The Corps grants unsupervised visitation only if a student attains a certain status and is given permission. In accordance with *Raines*, we conclude that McClendon was in Job Corps' care, preservation, and protection and was, therefore, within its "custody" as defined by section 14-27.7(a).

Defendant argues that *Raines* is inapplicable to the present case because the facts presented in *Raines* are wholly distinguishable from those in the case *sub judice*. We agree that there may be a significant difference between patients in hospitals, some of whom are physically unable to leave a facility due to the condition that motivated their admission, and Job Corps participants. However, the *Raines* Court did not limit its holding to the facts presented by that case. Rather, the crux of the *Raines* decision was that the General Assembly did not intend "custody" under section 14-27.7(a) as a narrow concept, limited "to legal control or restraint." *Id.* at 262, 354 S.E.2d at 489.

We further recognize that this is a close case concerning whether "custody" existed under section 14-27.7(a), particularly given the freedoms periodically granted Job Corps participants and their ability to withdraw from the program at anytime. Nevertheless, as noted *supra*, the Supreme Court's decision in *Raines* does not require that a victim be involuntarily or physically confined, or that an institution obtain legal custody of the victim for the victim to be considered in "custody" under section 14-27.7(a). Being bound by the *Raines* decision, we consequently find that the very specific factual scenario presented by this case, construed in the light most favorable to the State, constitutes the offense of sexual activity by a custodian in violation of section 14-27.7(a). Accordingly, we conclude that the trial court did not err in refusing to grant defendant's motions to dismiss.

For the reasons stated herein, we find that defendant received a fair trial, free from prejudicial error.

No error.

Judges MARTIN and TYSON concur.