*806
 
 McCULLOUGH, Judge.
 

 *851
 
 James McLean ("defendant") appeals from judgments entered upon his convictions of assault with a deadly weapon inflicting serious injury, robbery with a dangerous weapon, and discharging a firearm from within a building with the intent to incite fear. On appeal, defendant argues that judgment entered upon his conviction for discharging a firearm within a building with the intent to incite fear must be vacated, the trial court erred by denying his motion to dismiss the robbery with a dangerous weapon charge, the trial court erred by allowing Lieutenant Jason Butler to vouch for the credibility of a victim, the trial court erred by allowing Shaquana McInnis to provide testimony amounting to inadmissible hearsay, and the trial court erred by assessing a fee against defendant to pay for the State's expert witness. For the reasons stated herein, we hold no error in part and vacate in part.
 

 *852
 
 I.
 
 Background
 

 On 27 October 2014, defendant was indicted for the following: attempted first degree murder in violation of
 
 N.C. Gen. Stat. § 14-17
 
 ; assault with a deadly weapon with intent to kill inflicting serious injury in violation of
 
 N.C. Gen. Stat. § 14-32
 
 (a) ; robbery with a dangerous weapon in violation of
 
 N.C. Gen. Stat. § 14-87
 
 ; and, discharging a firearm within an enclosure to incite fear in violation of
 
 N.C. Gen. Stat. § 14-34.10
 
 .
 

 Defendant's trial commenced at the 12 October 2015 criminal session of Scotland County Superior Court, the Honorable James M. Webb presiding. The State's evidence tended to show as follows: On 25 April 2014, approximately nine people, including the State's witnesses Rodrigues McRae ("McRae"), Vincent Smith ("Smith"), John Shaw ("Shaw"), Acey Braddy ("Braddy"), and Shaquana McInnis ("McInnis"), were playing cards in a cinder-block building behind a residence located at 508 Morris Street in Laurinburg, North Carolina. Sometime between 3:00 and 4:00 a.m., four individuals, each armed, entered the building. Three of the intruders had on masks and one was unmasked. The unmasked man said, "Don't move[ ]" and "Y'all killed my brother. I'm going to terrorize you Laurinburg mother****ers[.]" The unmasked man then fired two shots. Braddy was shot in his chest and said "Man, you shot me. You shot me." McRae and Braddy identified the unmasked shooter who shot Braddy as defendant.
 

 Defendant ordered everyone to "get facedown on the ground and take our clothes off[ ]" and then said, "Give me all your money." Braddy testified that the three masked intruders "just stood like soldiers[ ]" while defendant "did everything by hisself [sic]." McRae testified that "I just took my pants and my wallet and everything, and my keys and my cell phone, and just gave it all to them." The following items were taken from the State's witnesses: a cell phone and twenty dollars from Smith; $800.00 from Shaw; a cell phone and money from Braddy; and "a couple hundred dollars" from McInnis. The testimony from Smith, Shaw, and McInnis corroborated Braddy and McRae's testimony.
 

 Lieutenant Jason Butler ("Lieutenant Butler") from the Laurinburg Police Department testified that in the early morning hours of 26 April 2014, he was dispatched to Scotland Memorial Hospital in reference to a gunshot wound. Lieutenant Butler was directed to a trauma room where he interviewed Braddy. Braddy had suffered a single gunshot wound. Braddy informed Lieutenant Butler that he was playing cards with several people when four people ran into the room, three of them wearing masks, and one of them made the statement, "Y'all killed my brother.
 

 *853
 
 I'm going to terrorize you n****** in Laurinburg." Braddy stated that the intruders ordered them "to take their clothes off and lay on the ground, where some cash and cell phones and things like that were taken from them." As the intruders were exiting, Braddy heard a gunshot and felt pain in his back. Braddy told Lieutenant Butler that the unmasked person was "the brother of Chris McKoy." Lieutenant Butler testified that Braddy "was agitated and seemed to be in some pain. But he was-to me, he seemed truthful."
 

 Officer Merica Zabitosky ("Officer Zabitosky"), who was employed with the City of Laurinburg, interviewed Braddy later that morning on 26 April 2014. Braddy identified defendant as the masked shooter, gave a description of defendant's appearance, and
 
 *807
 
 stated that defendant "[l]ook[ed] just like his brother Chris McKoy[.]"
 

 At trial, McInnis testified that after the robbery, she was incarcerated. While in a holding cell with a few other females, she heard one of the females having a conversation with a man in a nearby cell. The man wanted to know the identity of all the females in the cell. McInnis provided her name and the man said through the cell wall, "You wrote a statement against me[.]" McInnis testified that she recognized the voice as that of the unmasked shooter from the 26 April 2014 robbery. McInnis responded that she did not write a statement and the male voice said "that they were going to put him in a cell with me, and 'We'll see what you say then.' " McInnis testified that she asked the jailer whether "James McLean" was in there and "she did say he was in there." McInnis testified that because of this incident, she was scared to testify.
 

 On 15 October 2015, a jury found defendant not guilty of attempted first degree murder. The jury found defendant guilty of assault with a deadly weapon inflicting serious injury, robbery with a firearm, and discharging a firearm from within a building with the intent to incite fear.
 

 Defendant was sentenced as a prior record level IV to 38 to 58 months for his assault with a deadly weapon inflicting serious injury conviction, 97 to 129 months for his robbery with a dangerous weapon conviction, and 25 to 39 months for discharging a firearm from within a building with the intent to incite fear conviction.
 

 Defendant appeals.
 

 II.
 
 Discussion
 

 Defendant presents five issues on appeal. We address each in turn.
 

 *854
 
 A.
 
 Discharging a Firearm Within an Enclosure to Incite Fear
 

 In his first argument on appeal, defendant contends that the judgment entered upon his conviction for discharging a firearm
 
 within
 
 an enclosure to incite fear must be vacated because the indictment was insufficient to charge defendant with that crime. The State concedes and we agree.
 

 "This Court reviews the sufficiency of an indictment
 
 de novo
 
 ."
 
 State v. Mann
 
 ,
 
 237 N.C.App. 535
 
 , 539,
 
 768 S.E.2d 138
 
 , 141 (2014). "[A] valid bill of indictment is essential to the jurisdiction of the trial court to try an accused for a felony."
 
 State v. Miranda
 
 ,
 
 235 N.C.App. 601
 
 , 605,
 
 762 S.E.2d 349
 
 , 353 (2014) (citation omitted). "An indictment for a statutory offense is sufficient, as a general rule, when it charges the offense in the language of the statute."
 
 State v. Penley
 
 ,
 
 277 N.C. 704
 
 , 707,
 
 178 S.E.2d 490
 
 , 492 (1971).
 

 Here, the "discharging a firearm within enclosure to incite fear" indictment charged that "defendant named above unlawfully, willfully and feloniously did discharge a handgun, a firearm,
 
 into
 
 an occupied structure with the intent to incite fear in others. This act was in violation of North Carolina General Statutes Section
 
 14-34.10
 
 ." (emphasis added).
 

 N.C. Gen. Stat. § 14-34.10
 
 , entitled "Discharge firearm within enclosure to incite fear[,]" provides that "any person who willfully or wantonly discharges or attempts to discharge a firearm
 
 within
 
 any occupied building, structure, motor vehicle, or other conveyance, erection, or enclosure with the intent to incite fear in another shall be punished as a Class F felon."
 
 N.C. Gen. Stat. § 14-34.10
 
 (2015) (emphasis added).
 
 N.C. Gen. Stat. § 14-34.1
 
 , entitled "Discharging certain barreled weapons or a firearm into occupied property[,]" provides that
 

 [a]ny person who willfully or wantonly discharges or attempts to discharge any firearm or barreled weapon capable of discharging shot, bullets, pellets, or other missiles at a muzzle velocity of at least 600 feet per second
 
 into
 
 any building, structure, vehicle, aircraft, watercraft, or other conveyance, device, equipment, erection, or enclosure while it is occupied is guilty of a Class E felony.
 

 N.C. Gen. Stat. § 14-34.1
 
 (a) (2015) (emphasis added).
 

 The indictment in question attempted to charge defendant of violating
 
 N.C. Gen. Stat. § 14-34.10
 
 but failed to accurately and sufficiently charge that offense. Instead, the indictment alleged that defendant discharged a
 
 *808
 
 firearm "into" an occupied structure. As such, we hold that the
 
 *855
 
 indictment was insufficient to confer jurisdiction upon the trial court. Defendant's judgment entered upon his conviction for discharging a firearm from within a building with the intent to incite fear is vacated.
 

 B.
 
 Robbery with a Dangerous Weapon
 

 In the second issue on appeal, defendant contends that the trial court erred by denying his motion to dismiss the robbery with a dangerous weapon charge. Specifically, defendant argues that there was insufficient evidence that he committed a taking from Braddy's person or presence. We disagree.
 

 Our Court reviews
 
 de novo
 
 the trial court's motion to dismiss.
 
 State v. Bagley
 
 ,
 
 183 N.C.App. 514
 
 , 523,
 
 644 S.E.2d 615
 
 , 621 (2007). "A trial court should deny a motion to dismiss if, considering the evidence in the light most favorable to the State and giving the State the benefit of every reasonable inference, there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense."
 
 State v. Lawson
 
 ,
 
 194 N.C.App. 267
 
 , 278,
 
 669 S.E.2d 768
 
 , 775-76 (2008) (internal quotation marks and citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Vause
 
 ,
 
 328 N.C. 231
 
 , 236,
 
 400 S.E.2d 57
 
 , 61 (1991) (citation and quotation marks omitted).
 

 The elements of robbery with a dangerous weapon are: (1) the unlawful
 
 taking
 
 or an attempt to take personal property
 
 from the person or in the presence of another
 
 (2) by use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened.
 

 State v. Hill
 
 ,
 
 365 N.C. 273
 
 , 275,
 
 715 S.E.2d 841
 
 , 843 (2011) (citation and internal quotation marks omitted) (emphasis added). Our Court has stated that:
 

 [t]he word "presence" ... must be interpreted broadly and with due consideration to the main element of the crime-intimidation or force by the use or threatened use of firearms. "Presence" here means a possession or control by a person so immediate that force or intimidation is essential to the taking of the property.
 

 State v. Cole
 
 ,
 
 199 N.C.App. 151
 
 , 156,
 
 681 S.E.2d 423
 
 , 427 (2009) (citation omitted).
 

 *856
 
 To establish that defendant took personal property from Braddy's person or presence, the State presented the following evidence: Four intruders, three masked and one unmasked, entered a cinderblock building in the early morning hours of 25 April 2014. All four men were armed. McRae and Braddy identified the unmasked shooter who shot Braddy as defendant. McRae testified that defendant, as well as others, were ordering the occupants of the building to "get facedown on the ground and take our clothes off." McRae testified that defendant said, "Get butt-a** naked. Give me all your money." Braddy testified that "Mr. McLean did everything by hisself [sic][ ]" while the other three intruders "just stood like soldiers." Braddy further testified that "everybody got robbed. A few people got their clothes took off. He took cell phones." In addition, the following exchange occurred:
 

 [THE STATE:] When you were laying there on the ground, was anything taken from you as far as property?
 

 [BRADDY:] My cell phone.
 

 [THE STATE:] Anything else?
 

 [BRADDY:] No. The money had been tooken [sic].
 

 Viewing the foregoing evidence in the light most favorable to the State, we hold that there was substantial evidence that defendant took personal property from Braddy's person or presence.
 
 See
 

 State v. Locklear
 
 ,
 
 322 N.C. 349
 
 , 358,
 
 368 S.E.2d 377
 
 , 383 (1988) ("If there is substantial evidence-whether direct, circumstantial, or both-to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.") (citation omitted). Accordingly, the trial court did not err by denying defendant's motion to dismiss the robbery with a dangerous weapon charge.
 

 C.
 
 Testimony of Lieutenant Jason Butler
 

 In the third issue on appeal, defendant argues that the trial court committed
 
 *809
 
 plain error by allowing Lieutenant Butler to testify that Braddy "seemed truthful" and that he felt Braddy wanted police to find the perpetrator. Defendant contends that Lieutenant Butler's testimony constituted an opinion which tended to vouch for the credibility of Braddy.
 

 On 26 April 2014, Lieutenant Butler interviewed Braddy at the hospital. Defendant challenges the following exchange between the State and Lieutenant Butler:
 

 *857
 
 Q. Okay. Generally, what was Mr. Braddy's demeanor like when he was talking to you?
 

 A. He was agitated and seemed to be in some pain. But he was-to me, he seemed truthful. I mean, I think he wanted-I felt that he wanted me to-or us, the police department, to find the people that had injured him.
 

 We first note that because defendant failed to object to the admission of this testimony, "the proper standard of review is a plain error analysis[.]"
 
 State v. Gary
 
 ,
 
 348 N.C. 510
 
 , 518,
 
 501 S.E.2d 57
 
 , 63 (1998).
 

 [T]he plain error rule ... is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "
 
 fundamental
 
 error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."
 

 State v. Odom
 
 ,
 
 307 N.C. 655
 
 , 660,
 
 300 S.E.2d 375
 
 , 378 (1983) (citation omitted).
 

 Rule 701 of the North Carolina Rules of Evidence provides that "[i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2015). Our Courts have held that "when one witness vouch[es] for the veracity of another witness, such testimony is an opinion which is not helpful to the jury's determination of a fact in issue and is therefore excluded by Rule 701."
 
 State v. Global
 
 ,
 
 186 N.C.App. 308
 
 , 318,
 
 651 S.E.2d 279
 
 , 286 (2007) (citation and internal quotation marks omitted).
 

 In the present case, Lieutenant Butler testified that Braddy "seemed truthful[.]" This was an opinion that vouched for the veracity of another witness. The jury had the opportunity to make an independent determination of Braddy's veracity when Braddy testified at trial. Therefore, Lieutenant Butler's opinion of Braddy's veracity was not helpful to the
 
 *858
 
 jury and admission of this testimony amounted to error. However, we conclude that it did not amount to plain error given the testimony from four other witnesses, McRae, Smith, Shaw, and McInnis, which corroborated Braddy's testimony.
 

 D.
 
 Testimony of Shaquana McInnis
 

 In the fourth issue on appeal, defendant argues that the trial court committed plain error by allowing Shaquana McInnis to testify that after the 25 April 2014 incident, while she was incarcerated, a jailer told her that defendant was in a jail cell adjacent to hers. Defendant argues that because the jailer did not testify at trial and her testimony was offered for the truth of the matter asserted, that defendant was in the holding cell, McInnis' testimony amounted to inadmissible hearsay.
 

 " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1(a), Rule 801 (2015). Generally, hearsay evidence is inadmissible.
 
 State v. Valentine
 
 ,
 
 357 N.C. 512
 
 , 515,
 
 591 S.E.2d 846
 
 , 851 (2003). However, "[o]ut-of-court statements offered for purposes other than to prove the truth of the matter asserted are not considered hearsay."
 

 *810
 

 State v. Castaneda
 
 ,
 
 215 N.C.App. 144
 
 , 147,
 
 715 S.E.2d 290
 
 , 293 (2011) (citation omitted).
 

 At trial, McInnis testified that she was afraid to give a formal written statement to police and to testify. She explained that she was afraid to testify because of an incident that occurred previously. While incarcerated and in a holding cell with other females, McInnis heard one of the women having a conversation with a man in an adjacent cell. The man wanted to know the identity of all the women. McInnis provided her name and the man said through the cell wall, "You wrote a statement against me[.]" McInnis testified that she recognized the voice as that of the unmasked shooter from the 26 April 2014 robbery. McInnis responded by denying that she wrote a statement and the male voice replied "that they were going to put him in a cell with me, and 'We'll see what you say then.' " McInnis could not see into the men's holding cell. McInnis then asked a jailer whether "James McLean" was in the adjacent cell and the jailer confirmed that he was. Defendant did not object to the admission of the foregoing testimony.
 

 Upon thorough review, we hold that defendant's argument has no merit. The challenged testimony in the case
 
 sub judice
 
 was not offered to prove the truth of the matter asserted. Rather, it was offered to explain why McInnis was afraid to testify. Even assuming
 
 arguendo
 
 that McInnis' testimony amounted to inadmissible hearsay, the admission of
 
 *859
 
 this testimony did not amount to plain error in light of the substantial evidence of defendant's guilt.
 

 E.
 
 Fee for the State's Witness
 

 In his last argument on appeal, defendant contends that the trial court erred by assessing a fee against him to pay for the State's expert witness, Doctor Scott Martinelli ("Dr. Martinelli"). We agree.
 

 At trial, the State called on Dr. Martinelli, an emergency-room physician who worked at Scotland Memorial Hospital. Dr. Martinelli was accepted as an expert in the field of emergency medicine and testified regarding the treatment he administered to Braddy on 26 April 2014. During sentencing, the trial court ordered that defendant, as a condition of any early release or post-release supervision, must reimburse the State $5,075.00 for the services of his court-appointed attorney, $60.00 appointment fee, and $780.00 for the testimony of Dr. Martinelli.
 

 The trial court also signed a form "CR-231" from the Administrative Office of the Courts on 15 October 2015. The form was entitled "Order for Expert Witness Fee in Criminal Cases at the Trial Level" and provided as follows:
 

 The Court finds that:
 

 The person named below[, Dr. Martinelli,] was compelled to attend court and testify as an expert, or provided necessary expert services pursuant to a prior court order, and the person named below was duly sworn and gave testimony of such nature and character as to qualify as an expert witness, or provided services that were necessary expenses of prosecution; and
 

 Therefore, it is ORDERED that the amount listed as Total Compensation and Reimbursables To Be Paid be allowed this expert,
 
 to be paid from Judicial Branch funds by the North Carolina Administrative Office of the Courts.
 
 It is further ORDERED that all reasonable and necessary expenses already incurred, in accordance with G.S. 7A-343(9f), by the North Carolina Administrative Office of the Courts associated with this witness' appearance to be paid from the Judicial Branch funds by the North Carolina Administrative Office of the Courts.
 

 (emphasis added). The total compensation and reimbursables to be paid was listed as $780.00.
 

 *860
 
 The order listed several statutes regarding the authority of the trial court to order compensation for an expert: N.C. Gen. Stat. §§ 7A-300, 7A-314, 7A-343, 7A-454, and 8C-1, Rule 702. N.C. Gen. Stat. § 7A-300 lists the various expenses necessary for the proper functioning of the Judicial Department, including "[f]ees and travel expenses ... of witnesses required to be paid by the State[,]" and provides that the operating expenses of the Judicial Department "shall be paid from State funds, out of appropriations for this purpose made by the General Assembly, or
 
 *811
 
 from funds provided by local governments pursuant to G.S. 7A-300.1, 153A-212.1, or 160A-289.1." N.C. Gen. Stat. § 7A-300(a)(6) (2015). N.C. Gen. Stat. § 7A-314 sets out how witness fees and compensation are to be determined. N.C. Gen. Stat. § 7A-343 lists the duties of the Director of the Administrative Officer of the Courts, including "[p]rescrib[ing] policies and procedures for payment of those experts acting on behalf of the court or prosecutorial offices, as provided for in G.S. 7A-314(d)." N.C. Gen. Stat. § 7A-343(9f) (2015). N.C. Gen. Stat. § 7A-454 provides that "[f]ees for the services of an expert witness ... for an indigent person and other necessary expenses of counsel shall be paid by the State in accordance with rules adopted by the Office of Indigent Defense Services." N.C. Gen. Stat. § 7A-454 (2015). Lastly, N.C. Gen. Stat. § 8C-1, Rule 702 states that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion[.]" N.C. Gen. Stat. § 8C-1, Rule 702(a) (2015).
 

 From the record, there does not appear to be any statutory authority for the trial court to require defendant, as a condition of any early release or post-release supervision, to pay the expenses of the State's expert witness, Dr. Martinelli. The 15 October 2015 order of the trial court explicitly states that Dr. Martinelli is "to be paid from Judicial Branch funds by the North Carolina Administrative Office of the Courts." As such, we vacate the trial court's assessment of an expert witness fee as a condition of any early release or post-release supervision.
 

 III.
 
 Conclusion
 

 Defendant's judgment entered upon his conviction for discharging a firearm within a building with intent to incite fear is vacated. The trial court did not err by denying defendant's motion to dismiss the robbery with a dangerous weapon charge. The trial court did not commit plain error by allowing Lieutenant Butler to testify that Braddy "seemed truthful" or by allowing McInnis to testify that a jailer informed her that defendant was in an adjacent holding cell. We vacate the trial court's
 
 *861
 
 assessment of an expert witness fee as a condition of any early release or post-release supervision.
 

 NO ERROR IN PART; VACATED IN PART.
 

 Judges ELMORE and STROUD concur.