Justice EARLS, dissenting.
Here the State presented evidence that a high school student threw a chair in his school cafeteria. Beyond the basic fact that a chair was thrown, the State's sole witness to this event, the school's resource officer, provided few details regarding the specifics of this chair-throwing, save that the chair did not hit anyone, that the officer did not see anyone moving to avoid being hit by the chair, and that the officer could not say, despite being very close to the student, whether there was any risk of the chair striking any other person or object in the cafeteria. The officer testified that the student later told him that the student had thrown the chair "at his brother because they were playing or something." The majority considers this testimony to be substantial evidence from which a rational juror could find-beyond a reasonable doubt-that the student, T.T.E., is guilty of the Class 2 misdemeanor offense of disorderly conduct on the basis that he intentionally caused a public disturbance by engaging in violent conduct . Either the majority is adopting **424 an uncommonly broad view of what constitutes violent conduct, or, in applying what it deems a "relatively low threshold" for sufficiency of the evidence,[1] the majority is mistaking evidence that raises a mere suspicion of guilt for substantial evidence. In any event, because I conclude that the State presented insufficient evidence that T.T.E. committed the offense of disorderly conduct by intentionally causing a public disturbance by engaging in violent conduct, I respectfully dissent.
"Disorderly conduct" is a criminal offense defined as "a public disturbance[2 ] intentionally caused by any person who" commits any of the acts set forth in N.C.G.S. § 14-288.4(a)(1)-(8), including, inter alia , any person who:
*301 (1) Engages in fighting or other violent conduct or in conduct creating the threat of imminent fighting or other violence.
....
(6) Disrupts, disturbs or interferes with the teaching of students at any public or private educational institution or engages in conduct which disturbs the peace, order or discipline at any public or private educational institution or on the grounds adjacent thereto.
N.C.G.S. § 14-288.4(a)(1), (6) (2017). Here, Deputy Mickey Ray of the Buncombe County Sheriff's Office filed a petition in district court on 8 November 2016 alleging that T.T.E. was a delinquent juvenile because he had committed the Class 2 misdemeanor offense of disorderly conduct by "intentionally caus[ing] a public disturbance at Clyde A. Erwin High School, Buncombe County NC, by engaging in violent conduct. This conduct consisted of throwing a chair toward another student in the school's cafeteria."
**425 The majority concludes that although the disorderly conduct petition did not specify which of the various subsections of N.C.G.S. § 14-288.4(a) was at issue, the petition gave sufficient notice to T.T.E. of the specific conduct and offense for which he was being charged because it closely tracked the language of N.C.G.S. § 14-288.4(a)(1) ("Engages in ... violent conduct"). Assuming arguendo that T.T.E. did have sufficient notice that he was being charged under (a)(1),[3] the State was, as a result, necessarily limited to proceeding on what was alleged in the petition-namely, that T.T.E. intentionally committed the offense of disorderly conduct under (a)(1) by "engaging in violent conduct," specifically "by throwing a chair toward another student in the cafeteria."
Accordingly, the State was required to present substantial evidence that T.T.E. intentionally caused a public disturbance by engaging in violent conduct by throwing a chair toward another student in the cafeteria. See State v. Barnes , 345 N.C. 146, 148, 478 S.E.2d 188, 189 (1996) (stating that a "motion to dismiss must be allowed unless the State presents substantial evidence of each element of the crime charged" (quoting State v. Davis , 340 N.C. 1, 11, 455 S.E.2d 627, 632, cert. denied , 516 U.S. 846, 116 S.Ct. 136, 133 L.Ed.2d 83 (1995))). "Evidence is not substantial if it arouses only a suspicion about the fact to be proved, even if the suspicion is strong." State v. Sumpter , 318 N.C. 102, 108, 347 S.E.2d 396, 399 (1986) (citing State v. Malloy , 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983) ); see also State v. Turnage , 362 N.C. 491, 494, 666 S.E.2d 753, 755 (2008) ("A motion to dismiss should be granted, however, 'where the facts and circumstances warranted by the evidence do no more than raise a suspicion of guilt or conjecture since there would still remain a reasonable doubt as to defendant's guilt.' " (quoting State v. Stone , 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988) )). While the majority, in its discussion of the applicable de novo standard of review, correctly notes that "[s]ubstantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion," Turnage , 362 N.C. at 493, 666 S.E.2d at 755 (citation omitted), it is helpful to bear in mind the nature of this "conclusion" that must be adequately supported. Specifically, "[s]ubstantial evidence is evidence from which any rational trier of fact could find the fact to be proved beyond a reasonable doubt ." Sumpter , 318 N.C. at 108, 347 S.E.2d at 399 (emphasis added) (citing **426 State v. Pridgen , 313 N.C. 80, 94-95, 326 S.E.2d 618, 627 (1985) ); see also State v. Trull , 349 N.C. 428, 447, 509 S.E.2d 178, 191 (1998) ("A defendant's motion to dismiss must be denied if the evidence considered in the light most favorable to the State permits a rational jury to find beyond a reasonable doubt the existence of each element of the charged crime and that defendant was the perpetrator." (citation omitted)). After all, the evidentiary standard in a juvenile delinquency proceeding is the same as that in adult criminal proceedings. See *302 N.C.G.S. § 7B-2409 (2017) ("The allegations of a petition alleging the juvenile is delinquent shall be proved beyond a reasonable doubt."); see also, e.g. , In re A.N.C., Jr. , 225 N.C. App. 315, 324, 750 S.E.2d 835, 841 (2013) ("A 'juvenile is therefore entitled to have the evidence evaluated by the same standards as apply in criminal proceedings against adults.' " (quoting In re Heil , 145 N.C. App. 24, 28, 550 S.E.2d 815, 819 (2001) )).
The only evidence presented here by the State concerning T.T.E.'s actions in the cafeteria was the testimony of Deputy Ray, who was the school resource officer for Clyde A. Erwin High School at the time of the incident. Although Ray was an eyewitness to the chair-throwing, as discussed further below, the most salient part of his testimony with respect to the offense charged was his second-hand relation of what T.T.E. told him after the incident:
Q. And did [T.T.E.] ever tell you why he threw the chair?
A. He said he was -- him and his brother -- he said he threw it at his brother because they were playing or something.
....
THE WITNESS: [T.T.E.] told me that him and his brother was having some issues, or were playing or something. And he threw the chair at his brother.
....
Q. So students would not have been disrupted, in that they weren't in that area to begin with, correct?
A. Yes, there was students there. At one particular time, there were students. They were not -- at the time that he threw the chair, I don't know if there was students at that particular time or not, because they were running from him, each other. They were playing -- horse playing with each other.
Q. Okay. So let's go back. Now we have students horse playing. So who was horse playing with whom?
**427 A. Well, according to his statement, after I talked to him and asked him what happened, he said that him and his brother was horse playing or he was doing something with his brother. And they were going at it.
Viewing it in the light most favorable to the State, Ray's testimony in this respect can fairly be said to raise a suspicion that T.T.E. engaged in violent conduct, but no more than a suspicion. For instance, any inference from this testimony alone that T.T.E. was attempting to strike or injure his brother with the chair, would not be one from which a rational jury could find such facts beyond a reasonable doubt. I cannot conclude that on the basis of this second-hand relation of T.T.E.'s out of court statements-to the effect that T.T.E. threw a chair at his brother because they were playing or something-any rational trier of fact could find beyond a reasonable doubt that T.T.E. intentionally threw a chair in a manner that constituted violent conduct in order to cause a public disturbance.
Certainly, there are ways in which throwing a chair would conceivably constitute violent conduct. Yet, unless the majority intends to hold that throwing a chair in a school cafeteria is per se violent conduct,[4] the **428 specifics *303 would seem necessary: How far and high did the chair travel? Was the chair thrown overhand or underhand? Was the chair moving fast or slow? Was the chair thrown with great force? How big was the chair? Did the chair make a loud crash? Was T.T.E. trying to hit his brother, or anyone or anything else? Was his brother waiting to catch the chair? Did the chair come close to hitting anything? The sole eyewitness to testify at the hearing on this issue, Deputy Ray, did provide the answers to a few of these questions. Of course, viewing his testimony in the light most favorable to the State, Ray's description of the event itself must largely be ignored as it tends to contradict the State's suggestion that that this chair-throwing amounted to violent conduct. See State v. Miller , 363 N.C. 96, 98, 678 S.E.2d 592, 594 (2009) (stating that "evidence unfavorable to the State is not considered" (citing State v. Parker , 354 N.C. 268, 278, 553 S.E.2d 885, 894 (2001), cert. denied , 535 U.S. 1114, 122 S.Ct. 2332, 153 L.Ed.2d 162 (2002) )).
According to Ray, the incident happened during "Warrior period ... where all the students get to just come out and relax a little bit, maybe hang out in the cafeteria." Ray was at the cafeteria wall, "just standing there observing" the 50 or 60 students in the cafeteria at that time. Near the end of Warrior period, Ray saw T.T.E. pick up a chair and throw it "in an underhanded motion." According to Ray, "I noticed [T.T.E.] pick up a chair and throw it across the cafeteria, kind of like, throw it across. ... I saw him pick up the chair, I thought he was just going to move it, but he kind of picked it up and chucked it." Ray testified:
Q. And you testified that this is in a cafeteria full of students -- about 50 or 60 students, correct?
A. Yes.
Q. And none of these students were touched with the chair?
A. No. Because --
Q. Did you see any students ducking from the chair being thrown across the cafeteria?
A. No. I didn't see any of that.
**429 After throwing the chair, T.T.E. "ran out of the cafeteria, and ran down to the foreign language halls." Ray testified that when T.T.E. threw the chair, he was "very close by" to T.T.E. and that T.T.E. was "pretty much, within [his] full range of sight." Despite his close proximity to T.T.E., Ray had few other details to offer:
Q. And did he throw it at anybody in particular, that you know of?
A. I can't remember, to be honest.
....
Q. Did it appear to you that, based on what you saw with the chair throwing incident, that [T.T.E.] was playing, or did it seem like something that was a little more violent?
A. I couldn't really tell[.]
....
Q.... Were any of the tables hit, whenever this chair was moved?
A. I can't recall.
Q. Do you know if any of the chairs were hit, due to the chair being moved or thrown?
A. I can't recall. Once he threw the chair, I turned around and went out, after he ran.
....
Q. Okay. So let's stop right there. Can you remember, if you recall, what was [T.T.E.] looking at when the chair was thrown?
A. Well, he looked down to pick up the chair, and he picked it up and threw it.
Q. And there were no children in his general vicinity, correct?
A. I can't really -- I can't tell.
*304 Thus, Ray's description of the event does little to bolster what is missing from T.T.E.'s out of court statement-that is explain what, exactly, about this chair-throwing made it violent conduct done intentionally to cause a public disturbance.
**430 The majority, perhaps recognizing the paucity of evidence concerning the actual throwing of the chair, devotes considerable attention to the evidence regarding what occurred after the chair was thrown in the cafeteria, when the "6'3-and-a-half" Deputy Ray chased down the "5 foot" tall T.T.E. in the foreign language hallway, "snuck up on him" and grabbed him by the sweatshirt, then "brought him back up to the main lobby where [Ray] put him on the wall, just to search him, and then put cuffs on him." It was at that point that T.T.E. "started cussing, calling [Ray] all kind of names" and was "when all the other kids started trying to get involved."[5] According to Ray, "Another guy, I had to handcuff him also, because he was trying to keep me from, you know, getting -- just, you know, detaining him. So, he came up behind me, and I grabbed him and put him on the wall also." This evidence was relevant to defendant's adjudication for the charge of resisting a public officer, which the Court of Appeals unanimously vacated for insufficient evidence, In re T.T.E. , 818 S.E.2d 324, 328-29 (2018), and which, because the State did not seek further review of that decision, is not before this Court. This evidence presumably would have been relevant had the State elected to adjudicate T.T.E. for disorderly conduct under a different section of N.C.G.S. § 14-288.4 and for conduct separate from that listed in the petition. This evidence, however, is irrelevant as to whether T.T.E. intentionally caused a public disturbance by engaging in violent conduct "by throwing a chair toward another student in the cafeteria."
**431 Indeed, much of the issue in this case stems from the fact while the petition limited the State to adjudicating T.T.E. for disorderly conduct based on his actions in the cafeteria, the State sought in earnest to adjudicate T.T.E. for his conduct after he threw the chair and left the cafeteria. For instance, at the hearing, the State argued in closing:
When that one student throws a chair, and then 50 or 60 students see the deputy standing up against the wall with his arms crossed, and doesn't do anything, now chair throwing is okay in the school cafeteria. So he goes down there to address that situation, make sure it doesn't happen again. And then it blew way out of proportion. It did not have to do that. Cuffs did not have to get involved. This did not -- this whole thing did not have to happen. It could've just been a quick, "Hey, what's going on? You horsing around? Well, don't do that anymore." But it was [T.T.E.] that elevated that situation.
....
Violent conduct is not just picking up a chair and removing it from the floor entirely, but also when you are standing in a hallway, surrounded by a bunch of students, a crowd, and telling an officer, "Fuck you. You ain't shit," and physically fighting with him. Now, that's absolutely disorderly conduct.
Certainly, "chair throwing ... in the school cafeteria" is normally not acceptable conduct, and schools have disciplinary measures to *305 address it. There are, however, countless situations in which such behavior falls short of "fighting or other violent conduct." When the State seeks to invoke criminal processes on the basis of such conduct, it must present substantial evidence that the conduct amounts to a criminal offense. Here the State failed to do so. Accordingly, I dissent.

The majority cites no precedent for the assertion that the sufficiency of evidence standard requires only a "relatively low threshold" of evidence.

As the majority notes, a "public disturbance" is defined as:
Any annoying, disturbing, or alarming act or condition exceeding the bounds of social toleration normal for the time and place in question which occurs in a public place or which occurs in, affects persons in, or is likely to affect persons in a place to which the public or a substantial group has access. The places covered by this definition shall include, but not be limited to, highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood.
N.C.G.S. § 14-288.1 (2017).

It is worth noting, however, that the State attempted to prove T.T.E.'s guilt at the adjudicatory hearing under both (a)(1) and (a)(6) ("Disrupts, disturbs or interferes with the teaching of students at any public or private educational institution or engages in conduct which disturbs the peace, order or discipline at any public or private educational institution or on the grounds adjacent thereto.").

This notion was rejected by the Court of Appeals majority below. Misconstruing that part of the opinion, the majority here asserts that the majority below "erroneously decided to ultimately determine whether the juvenile committed the offense of disorderly conduct." A fair reading of the Court of Appeals majority's decision, however, clearly shows that the court was not purporting to adjudicate an ultimate issue of fact, but rather concluded that the State's evidence only gave rise to a reasonable inference that a chair was thrown, which, without more, is not violent conduct as a matter of law and is therefore insufficient evidence to be presented to the jury:
The State contends the evidence shows "arguably violent conduct" because if the juvenile had thrown the chair at another student and if it hit them, "it presumably would have hurt them."
Although we view the evidence in the light most favorable to the State, we do not go so far as to come up with hypothetical events that could have happened if juvenile actually did something in addition to what the actual evidence shows. ... The State simply asks we infer too much from the evidence it presented.
The evidence was not sufficient to show that the juvenile fought, engaged in violent conduct, or created an imminent risk of fighting or other violence. Although there were other students in the cafeteria-a very large room-when the juvenile threw a chair, no other person was nearby, nor did the chair hit a table or another chair or anything else. Juvenile then ran out of the cafeteria. This is not "violent conduct or ... conduct creating the threat of imminent fighting or other violence." No one was hurt or threatened during the event and juvenile did not escalate the situation by yelling, throwing other things, raising fists, or other such conduct that along with the throwing of the chair could be construed to indicate escalating violent behavior. Throwing a single chair with no other person nearby and without attempting to hit another person and without hitting even any other item in the cafeteria is not disorderly conduct as defined by North Carolina General Statute § 14-288.4(a)(1). We vacate juvenile's adjudication and disposition for disorderly conduct.
In re T.T.E. , 818 S.E.2d at 327-28 (citations omitted) (second alteration in original).

The majority states that "[t]he deputy considered the juvenile's act of throwing the chair as constituting conduct that disrupted or disturbed the process of school, including the efforts of students to attend their classes in a timely fashion." This portion of the hearing was, in part, an attempt by the prosecutor to elicit testimony regarding N.C.G.S. § 14-288.4(a)(6), which was not alleged in the petition. More importantly, however, this statement was referring, not to the throwing of the chair in the cafeteria, of which there was no evidence concerning any disruption, but rather to T.T.E.'s conduct in the hallway when being detained by Ray:
Q. Now, as [T.T.E.] was pulling away from you and yelling at you, what duty were you trying to perform?
A. I was trying to detain him and bring him back to the office to sit down and have a discussion with the administrators and do what I needed to do. And at that point in time, he was resisting and didn't want to come.
Q. Based on your view of how the other students reacted to all of this as it was going on, did it, in your opinion, in any way disrupt or disturb the process of the school --
A. Absolutely.
Q. -- by which I mean, going back to classes?
A. Yes, sir. Absolutely.